Chief Justice CASTILLE, Justices EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.

36 A.3d 121

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**John Joseph KOEHLER, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 5, 2011.

Decided Jan. 20, 2012.

---

160

162

Elizabeth Ann Larin, Federal Community Defender Office, Eastern District of PA, James Moreno, Defender Association of Philadelphia, Philadelphia, for John Joseph Koehler, Jr.

James Patrick Barker, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice BAER.

In this capital case, John Joseph Koehler ("Appellant") appeals from an order of the Bradford County Common Pleas Court, which dismissed his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.[1] For the reasons set forth herein, we affirm the denial of relief.

The record establishes that in 1996, Appellant was convicted of the first degree murder of Regina Clark and her nine year-old son, Austin Hopper. The evidence presented at Appellant's trial established the following, as recited in our opinion on direct appeal. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999). In August of 1994, Appellant informed 18 year-old William Curley that he was a "hit man" for the mob. Appellant attempted to recruit Curley into his "profession" by promising that Curley could earn "six digits."[2] Curley enter-

1. This Court has exclusive jurisdiction to review a final order denying relief in a capital case pursuant to 42 Pa.C.S. § 9546(d).

2. While the nature of the relationship between Appellant and Curley is not evident from the record, it appears that Appellant knew Curley since he was a young child.

tained the proposition, believing that he would only kill drug dealers and individuals connected with the mob, not innocent people.

Eight months later, on April 17, 1995, while Curley was staying at the home of his friends, Melissa Mack and Ricky Hunsinger, Appellant informed Curley that he was bringing "two packages" and wanted Curly to "deliver them." Unbeknownst to Curley, Appellant meant that he was bringing two individuals to Curley, and wanted Curley to kill them. Curley unwittingly agreed. On April 18, 1995, at 4:00 a.m., Appellant arrived at the Mack/Hunsinger residence, accompanied by Regina Clark, with whom Appellant had a romantic relationship, and Clark's nine year-old son, Austin Hopper. Melissa Mack had the opportunity to observe Clark and her son while they stayed in Mack's home. It is unclear why Appellant chose Clark to be the victim of Curley's first killing.

Shortly after Appellant arrived, he explained to Curley that he wanted him to kill Clark. Curley, however, stated that he did not want to participate in the murder. In response, Appellant threatened that if Curley refused to kill Clark, Appellant would kill Curley. Appellant also gave Curley a loaded .22 caliber Baretta to use for the murder, and the two men located an abandoned refrigerator at a dump where they could dispose of Clark's body after the shooting. Curley again told Appellant that he did not want to kill Clark, to which Appellant responded, "kill or be killed." N.T. Mar. 28, 1996, Vol. VII at 47. The men thereafter agreed that Curley would kill Clark later that afternoon on Stone Jug Road.

Before acting upon their plans, Appellant and Curley drove Clark and Hopper to a restaurant. Appellant entered the restaurant, while Curley, Clark, and Hopper drove off, purportedly to retrieve another vehicle. The true purpose of the diversion was for Curley to kill Clark on Stone Jug Road. Curley drove to that location with Clark and Hopper, and pointed a gun to the back of Clark's head. Neither Clark nor Hopper observed the gun. Curley, however, could not pull the trigger, and, instead drove Clark and Hopper back to the restaurant to join Appellant.

That same afternoon, Appellant and Curley discussed where the murder should take place, and decided that it would occur at the home of Janet Schrader, as Curley was a friend of Schrader's son, Kirk. Hours later, Curley proceeded to the Schraders' residence, accompanied by Appellant, Clark, and Hopper. Everyone entered the Schraders' home, with the exception of Curley, who remained in the garage. Appellant and Kirk Schrader later joined Curley in the garage to discuss ways to kill Clark. When Curley told Appellant that he did not think he could execute the plan, Appellant responded that Curley had to kill Clark. Ultimately, Curley waited in the garage alone, and when Clark entered, shot her three times in the head. Curley then placed Clark in the trunk of his car. Appellant came to the garage to check Clark's pulse, and believed she was still alive. Appellant then suggested that Curley slit Clark's throat. Curley grabbed a knife, and then he and Kirk Schrader entered the car and drove off, hearing a thumping noise emanating from the trunk.

Curley dropped Kirk off at the home of Kirk's friend, Roger Hitchcock, and proceeded to dispose of Clark's body in the abandoned refrigerator at the dump. Curley slightly cut Clark's throat with the knife, closed the refrigerator door, and returned to the Schraders' residence. When he arrived, Appellant told Curley that Clark's nine year-old son, Austin Hopper, was a "loose link," and had to be killed. Shortly thereafter, Curley accompanied Hopper to the garage, and shot Hopper three times in the head and twice in the body. Curley then drove to "Snake Road," and placed the child's body in a sluice pipe.

When Curley arrived back at the Schraders' residence, he and Appellant cleaned the garage where the shootings took place. The two men thereafter returned to the abandoned refrigerator to secure it with a lock and chain, but the chain was too short. The men then drove to "Twin Ponds," where, upon Appellant's suggestion, Curley disposed of the knife and the gun used in the murders. Appellant later drove Curley to the Mack/Hunsinger residence, left him, and drove away. The following week, Curley moved to North Carolina.

Eight days after the murders, on April 26, 1995, a man searching for recyclables at the dump discovered Clark's body in the abandoned refrigerator, and contacted the police. Melissa Mack, with whom Appellant, Curley, and Clark had stayed prior to the killings, heard a news broadcast, which indicated that a woman's body wearing particular clothing had been discovered one-half mile from Mack's home. Mack recognized the clothing as that worn by Clark on the day of the shooting, and called police. Mack later identified the body discovered in the refrigerator as Clark's, and told police that Clark had been travelling with a child. Mack further consented to a search of her home, which revealed, *inter alia*, a lock and bullets.

On April 28, 1995, police officers travelled to North Carolina to interview Curley. Curley confessed to the shootings and told the officers where the boy's body could be found. He also revealed Appellant's involvement in the crimes, and disclosed where they had discarded the murder weapon. At 11:00 p.m. that evening, the police found Austin Hopper's body, and later recovered from Twin Ponds the gun and knife used in the murders. The police thereafter arrested Curley and charged him with the first degree murders of Clark and Hopper, various counts of criminal conspiracy, kidnapping, and aggravated assault, and one count each of endangering the welfare of a child and possession of an instrument of crime. The police also subsequently arrested Appellant for the first degree murders of Clark and Hopper, and charged him with related offenses. The Commonwealth tried Curley and Appellant separately, prosecuting Curley first.

Curley waived his right to a jury, and proceeded to a bench trial based on stipulated facts on March 6, 1996. Immediately prior to Curley's trial, however, the Commonwealth *nolle prossed* all the lesser charges against Curley, and proceed to prosecute him for two counts of first degree murder and one count of burglary. During Curley's trial, the Commonwealth's theory of criminal liability was that although Appellant solicited Curley to kill Clark and Hopper, Curley acted with his own free will in carrying out the crimes. Curley was thereaf-

ter convicted of two counts of first degree murder and one count of burglary.

On March 25, 1996, after Curley was convicted, but prior to his penalty proceeding, Appellant's trial commenced. To demonstrate Appellant's criminal liability for the first degree murders of Clark and Hopper based on a conspiracy and accomplice theory, the Commonwealth presented Curley's testimony, which described in detail Appellant's participation in the crimes. Curley informed the jury that in exchange for his testimony against Appellant, the Commonwealth would stipulate in Curley's upcoming penalty proceeding that his cooperation served as mitigating evidence. The Commonwealth also presented the testimony of Kirk Schrader, whose involvement in this matter has its own prolix history, which is explained fully *infra* at 135–38. Schrader testified that he observed Curley and Appellant discuss plans to kill Clark on the day of the murders. He explained that later that day, he heard gunshots being fired in his garage and saw Curley in the garage with his arm extended. The cars in the garage purportedly blocked Schrader's view of Curley's gun and Clark. Schrader further testified that he did not receive anything from the Commonwealth in exchange for his testimony.

The Commonwealth also presented the testimony of a forensic pathologist, who opined that the cause of Clark's death was a gunshot wound to the head, and the manner of her death was homicide. The forensic pathologist further testified that the cause of Hopper's death was multiple gunshot wounds, and that the manner of his death was homicide. Additionally, Kerrien Ramsey testified that she had travelled with Appellant, Clark, and Hopper, before the murders in February or March of 1995, and that Appellant showed Ramsey a loaded gun and told Ramsey that he would kill Clark.

On April 11, 1996, the jury convicted Appellant of two counts of first degree murder, two counts of conspiracy to commit murder, two counts of kidnapping, and one count of burglary. At the penalty phase of the trial, the Commonwealth urged the jury to find three aggravating circumstances:

(1) Appellant's conviction of another murder either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11) (relating to both murders); (2) that the victim was less than twelve years' old, *id.* § 9711(d)(16) (relating only to Hopper's murder); and (3) that the defendant paid or had contracted to pay or be paid by another person for the killing of the victim. *Id.* § 9711(d)(2). As mitigating evidence, the defense presented only the testimony of Appellant's mother, who explained that she divorced Appellant's father when Appellant was seven years old, that she was rarely home as she worked two jobs, and that her ex-husband had been physically abusive to Appellant. *See* N.T. Apr. 12, 1996, at 21–25.

As to the first degree murder of Clark, the jury found one aggravating circumstance (Appellant's conviction of another murder) and no mitigating circumstances. Regarding the first degree murder of Hopper, the jury found two aggravating circumstances (Appellant's conviction of another murder and the victim being less than twelve years' old) and no mitigating circumstances. Accordingly, the jury returned two death sentences. The trial court thereafter imposed two sentences of death, as well as additional terms of incarceration for the remaining offenses, totaling 35 to 70 years of imprisonment.[3]

Appellant, represented by trial counsel, filed a direct appeal in this Court, raising 15 issues. Finding no merit to his contentions, we affirmed Appellant's judgment of sentence. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999). The United States Supreme Court denied Appellant's petition for writ of certiorari on October 2, 2000. *Koehler v. Pennsylvania*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000).

On September 6, 2001, Appellant filed a timely petition for post-conviction relief entitled, "Petition for Habeas Corpus Relief Under Article I, Section 14 of the Pennsylvania Constitution and For Statutory Post–Conviction Relief under the Post Conviction Relief Act," in which he raised 19 issues,

---

**3.** Curley's penalty hearing commenced on May 20, 1996, and concluded on May 24, 1996. Because the jury deadlocked with respect to the death penalty, Curley was sentenced to life imprisonment.

primarily challenging prior counsel's effectiveness.[4] Several extensions of time were sought by the parties, and the trial court ("PCRA court") conducted evidentiary hearings on May 31, 2006, June 1, 2006, and March 1, 2007, at which Appellant presented the testimony of several witnesses including his prior counsel, who represented him at trial and on appeal.[5] Appellant's presentation of evidence at the hearing focused primarily on the following claims: (1) whether trial counsel was ineffective for failing to argue that the Commonwealth violated due process by setting forth a theory of criminal liability in Appellant's trial that was inconsistent with the theory of criminal liability it pursued in Curley's trial; (2) whether the Commonwealth violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose agreements it had entered into with key Commonwealth witnesses Curley and Schrader; and, (3) whether trial counsel was ineffective for failing to investigate and present sufficient mitigation evidence during the penalty phase of trial.

At the evidentiary hearing, Appellant did not question counsel regarding his trial strategy as it related to each claim of ineffectiveness presented. Further, when Appellant questioned counsel regarding his general handling of the direct appeal, counsel responded that he had no recollection of any particular appellate strategy. *See* N.T. May 31, 2006 at 49 (where counsel states, "I don't remember anything about the appeal. I wasn't aware that you were going to ask me questions in this area, and I made no attempt to refresh my recollection. It's been ten years and I don't have a good memory."). Counsel went on to testify, however, that his general appellate strategy was to raise any issue on appeal "that might well be viable." *Id.* at 50.[6]

4. The petition was 172 pages in length and included 471 enumerated paragraphs.

5. The trial court did not place any limits on Appellant's presentation of evidence at the evidentiary hearing.

6. We note that trial/appellate counsel's testimony spanned over two days. On the second day of testimony, Appellant did not question counsel's trial strategy relating to any issues contained in the PCRA petition, which were not addressed on the previous day. Further,

On June 30, 2009, the PCRA court issued an opinion and order denying collateral relief. The court found that while Appellant raised 19 issues in his PCRA petition, he pursued only the three aforementioned claims at the PCRA hearing and in his brief. As to the first issue addressed at the PCRA hearing, the court held that because there were no inconsistencies between the Commonwealth's theories in the separate prosecutions of Appellant and Curley, no due process violations resulted, and there was no basis for an ineffectiveness claim. The court reasoned that it was not inconsistent to argue in Appellant's trial that he solicited Curley to commit murder, and argue in Curley's trial that Curley was not under duress and acted with free will. It held that the evidence supported a finding that Curley was motivated to commit the offenses by both his fear of Appellant, and his belief that it would be "neat" to be a "hit man."

Concerning the second issue addressed at the PCRA hearing, the court held that the Commonwealth did not violate *Brady* by failing to disclose agreements it had purportedly entered into with Commonwealth witnesses Curley and Schrader. In reaching this conclusion, the PCRA court made specific factual findings based upon conflicting evidence presented, which is described in detail *infra*. As to Curley, the court found as a matter of fact that no undisclosed agreement existed between the Commonwealth and Curley; thus there was no exculpatory or impeaching evidence that the Commonwealth had a duty to disclose under *Brady*. As to Schrader, the court found that although the Commonwealth had entered into a non-prosecution agreement with Schrader, it had revoked the agreement prior to when Schrader testified at Appellant's trial. Thus, the PCRA court concluded that there was no undisclosed agreement that might have served to impeach Schrader, and no undisclosed exculpatory evidence. The PCRA court further held that Schrader's testimony was not critical to the prosecution, and, thus, any failure to disclose

Appellant did not ask counsel whether he had an opportunity to refresh his recollection of his appellate strategies.

evidence to impeach Schrader's testimony did not prejudice Appellant.

Finally, the PCRA court held that trial counsel was not ineffective for failing to present sufficient mitigating evidence. It concluded that while counsel devoted little time to developing mitigation evidence, and presented scant evidence at the penalty hearing, there was virtually no mitigation evidence available to trial counsel. Thus, the court held that Appellant failed to demonstrate that he was prejudiced by counsel's performance in this regard.

In response to Appellant's Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b), the PCRA court issued an opinion on December 30, 2009, referencing its June 30, 2006 opinion, which addressed the three claims described above. The court further explained that the remaining substantive claims were waived for failure to raise them on direct appeal, and the derivative ineffectiveness claims failed because Appellant "failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests." PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further held:

> Simply stated, Appellant cannot prove appellate counsel's ineffectiveness by merely identifying arguably meritorious claims. He must present evidence proving that appellate counsel had no reasonable strategic basis for failing to pursue the claims. Having failed to explore appellate counsel's reasoning, Appellant has not overcome the presumption that appellate counsel provided effective representation.

*Id.* at 6.

In his direct appeal from the denial of PCRA relief, Appellant now raises 13 issues. Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. *Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 886 (2010). The scope of review is limited to the findings of the PCRA court and the

evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level. *Id.*

To be eligible for PCRA relief, Appellant must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2) (listing, *inter alia*, the ineffective assistance of counsel and the unavailability at the time of trial of exculpatory evidence, which would have changed the outcome of the trial had it been introduced). Further, Appellant must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding." *Id.* § 9544(b).

The majority of Appellant's claims challenge the effectiveness of prior counsel. It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This Court has characterized the *Strickland* standard as tripartite, by dividing the performance element into two distinct parts. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987). Thus, to prove counsel ineffective, Appellant must demonstrate that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) Appellant was prejudiced by counsel's act or omission. *Id.* at 975.

Relating to the reasonable basis prong, "[g]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Colavita*, 993 A.2d at 887

(citing *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, 237 (1998)). Courts should not deem counsel's strategy or tactic unreasonable "unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.* Also "[a]s a general rule, a lawyer should not be held ineffective without first having an opportunity to address the accusation in some fashion. . . . The ultimate focus of an ineffectiveness inquiry is always upon counsel, and not upon an alleged deficiency in the abstract." *Colavita,* 993 A.2d at 895.

 Relating to the prejudice prong of the ineffectiveness test, the PCRA petitioner must demonstrate "that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different." *Commonwealth v. Ly,* 602 Pa. 268, 980 A.2d 61, 73 (2009). Particularly relevant herein, it is well-settled that "a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first." *Commonwealth v. Lesko,* 609 Pa. 128, 176, 15 A.3d 345, 374 (2011) (citing *Strickland, supra; Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998)).

As Appellant was represented by the same counsel at trial and on direct appeal, the first opportunity for him to challenge trial counsel's performance was on collateral review. *See Commonwealth v. Bennett,* 593 Pa. 382, 930 A.2d 1264, 1274 (2007) (recognizing general rule that counsel cannot raise his own ineffectiveness).[7] Under these circumstances, we need not examine appellate counsel's performance when addressing ineffectiveness claims that derive from an act or omission of

7. In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), which was decided before Appellant's direct appeal was filed, this Court abrogated the rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where a defendant has new counsel, *see Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977), and held that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant,* 813 A.2d at 738.

trial counsel. *See Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 775 n. 7 (2004) (providing that when appellant was represented by the same counsel at trial and on direct appeal, the PCRA proceeding is the first opportunity to challenge the stewardship of prior counsel and the analysis of such issue does not involve a layered claim of ineffectiveness). Stand-alone claims of appellate counsel ineffectiveness, which specifically challenge the manner by which appellate counsel litigated a claim on appeal (as opposed to the failure to raise an issue on direct appeal), will be examined, as these claims do not arise from counsel's acts or omissions at trial, and the PCRA proceeding is the first opportunity to challenge appellate counsel's performance in this regard.

## I. *Brady* Claims

 Appellant argues that the Commonwealth violated *Brady* by failing to disclose the separate agreements that it had entered into with Commonwealth witnesses Curley and Schrader. Before examining the details of the purportedly undisclosed agreements, we review the relevant law. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. This Court has held that to prove a *Brady* violation, the defendant has the burden of demonstrating that: "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant." *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 245 (2007) (citing *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 577–78 (2005)). Prejudice is demonstrated where the evidence suppressed is material to guilt or innocence. *Ly*, 980 A.2d at 75. Further, "[f]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *Commonwealth v. Paddy,* 609 Pa. 272, 304, 15 A.3d 431, 450 (2011) (citations omitted).

With this background in mind, we proceed to review Appellant's claims as they relate to the separate agreements allegedly entered into between the Commonwealth and Curley and Schrader.

### A. Purported Undisclosed Agreement with Curley

Initially, we acknowledge that Curley's testimony was critical to the prosecution as it served as the primary evidence that Appellant not only solicited Curley to kill the victims, but also threatened to kill Curley if he did not carry out the murders. As noted, Curley testified at Appellant's trial that the Commonwealth had agreed that Curley's cooperation with the authorities would serve as mitigating evidence at Curley's upcoming sentencing proceeding. Appellant contends, however, that Curley entered into a separate agreement with the Commonwealth, whereby he would testify against Appellant in exchange for the *nolle pros* of charges relating to the instant murders, including all counts of criminal conspiracy, kidnapping, and aggravated assault, and one count each of endangering the welfare of a child, and possession of an instrument of crime. He asserts that, immediately before Curley's bench trial, the Commonwealth dismissed these charges against Curley in exchange for his testimony against Appellant, and that such agreement constituted important impeachment evidence that the Commonwealth, pursuant to *Brady* and its progeny, was required to disclose.

In support of this claim, Appellant presented at the PCRA hearing the testimony of Attorney Kyle Rude, Curley's defense counsel. Attorney Rude testified that Curley had no incentive to testify against Appellant because District Attorney McGuinness had refused "to take the death penalty off the table." N.T. Jun. 1, 2006, at 27. Attorney Rude further stated that on March 6, 1996, immediately prior to Curley's bench trial on stipulated facts, he asked District Attorney McGuinness to "drop any of the charges" against Curley. *See*

*id.* at 28 (wherein Attorney Rude testified that "[a]t the last moment we agreed or I asked Mister McGuiness if he would be willing to drop any of the charges, just prior to the case stated trial. And that was not something that was for Mister Curley's testimony, but I call it a last little push-a nudge, at the end, before the case stated trial"). While conceding that the District Attorney did not expressly agree to dismiss the charges at issue in exchange for Curley's testimony against Appellant, Attorney Rude testified that the Commonwealth actually dismissed such charges shortly after he requested the same. *Id.* at 53, 58, 74. Appellant characterizes such action as an undisclosed deal between the Commonwealth and Curley, which the Commonwealth had an obligation to disclose to Appellant.[8]

The Commonwealth, however, presented evidence at the PCRA hearing disputing the existence of an undisclosed deal between Curley and the Commonwealth. Specifically, the Commonwealth presented the testimony of District Attorney McGuinness who explained that he agreed to *nolle pros* several charges against Curley prior to Curley's bench trial solely because he desired to make the case easier for the trial judge to render a prompt decision, as he wanted to have at least the guilt phase of Curley's trial concluded prior to Appellant's trial. *Id.* at 100. District Attorney McGuinness testified that the Commonwealth had very strong evidence against Curley supporting two counts of first degree murder and burglary, and was not concerned with the kidnapping and misdemeanor charges. *Id.* He further definitively stated that dismissing the lesser charges was never part of an agreement with Curley to obtain his testimony against Appellant. *Id.* at 99. Rather, District Attorney McGuinness emphasized, the full extent of the Commonwealth's agreement with Curley, as explained on the record at Appellant's trial, was that the Commonwealth agreed to stipulate that Curley's cooperation in Appellant's

8. Also in support of this claim, Appellant presented his trial counsel's testimony that he was unaware that a series of charges against Curley had been dropped prior to Curley's trial, and had he been aware, he would have used this evidence to impeach Curley's testimony during Appellant's trial. *Id.* at 13.

prosecution would serve as mitigating evidence at Curley's sentencing. *Id.*

The PCRA court credited the testimony of District Attorney McGuinness and found as a matter of fact that there was no undisclosed agreement between Curley and the Commonwealth. Consistent with both District Attorney McGuinness' testimony at the PCRA hearing and Curley's testimony at Appellant's trial, the PCRA court held that the only consideration for Curley's testimony was that it would serve as mitigating evidence at Curley's sentencing hearing—a fact of which Appellant's jury was keenly aware. The court concluded that the "deal" that Appellant faulted the Commonwealth for not disclosing did not exist, thus, there was no *Brady* violation.

The Commonwealth argues that there is ample support in the record for the PCRA court's factual finding that no undisclosed agreement existed between the Commonwealth and Curley, thus, no impeachment evidence was suppressed. It relies on the testimony of District Attorney McGuinness, as referenced above, as well as Curley's testimony at Appellant's trial that the only benefit he received in exchange for his testimony against Appellant was that such testimony would serve as mitigating evidence at Curley's sentencing. The Commonwealth points out that the PCRA court credited the testimony of District Attorney McGuinness, and that this Court cannot, pursuant to Appellant's suggestion, reweigh the evidence presented.

Upon careful review of the record, we agree with the Commonwealth that there is ample support for the PCRA court's factual finding that the Commonwealth's dismissal of lesser criminal charges prior to Curley's murder trial did not serve as consideration for Curley's subsequent testimony at Appellant's trial. *See id.* at 99 (where District Attorney McGuiness indicates that the agreement with Curley did not, in any way, include the dismissal of certain charges against Curley). Because there was no undisclosed agreement between the Commonwealth and Curley regarding the dismissal of charges against Curley, no exculpatory or impeaching evi-

dence existed that the Commonwealth had an obligation to disclose under *Brady*. Appellant was, therefore, properly denied collateral relief on this claim.[9]

### B. Purported Agreement with Schrader

Appellant next argues that the Commonwealth violated *Brady* by failing to disclose that, in exchange for Schrader's testimony against Appellant, the Commonwealth had agreed not to prosecute Schrader for any offenses related to the instant murders. As noted, Schrader testified at Appellant's trial that he observed Curley and Appellant discuss plans to kill Clark, and that later that day, he heard gunshots being fired in his garage, and saw Curley in the garage with his arm extended. The cars in the garage purportedly blocked Schrader's view of Curley's gun and Clark. Schrader's testimony was critical to the prosecution, Appellant maintains, because Schrader was the only witness who could corroborate Curley's version of the events. Schrader also testified at Appellant's trial that he did not receive promises of leniency from the Commonwealth in exchange for his testimony. Appellant submits that the Commonwealth emphasized this in its closing argument when the prosecutor told the jury there were no offers of immunity and no deals to obtain Schrader's testimony. *See* N.T. Apr. 10, 1996, Vol. XXVI, at 21 (where the prosecutor, in closing argument, stated that no immunity was given to Schrader and that Schrader's testimony could be used against him). This was false, Appellant argues, because the evidence at the PCRA hearing demonstrates that a non-prosecution agreement existed.

Although Schrader had no charges pending against him at the time of Appellant's trial, Appellant points out that Schrad-

9. In connection with this *Brady* issue, Appellant argues that trial counsel was ineffective for failing to investigate adequately and impeach Curley with the undisclosed agreement he entered into with the Commonwealth. The PCRA court did not address this independent claim. Because we have concluded that no such agreement existed, trial counsel cannot be deemed ineffective for failing to discover and utilize the agreement to impeach Curley. Accordingly, this specific claim of ineffectiveness fails for lack of arguable merit.

er was arrested one month later and charged with hindering apprehension or prosecution, aiding consummation of a crime, and criminal conspiracy, stemming from the instant murders. The Commonwealth's information charged that Schrader, knowing that Curley had already killed Clark upon Appellant's direction, intentionally aided Curley and Appellant in an unlawful objective by supplying the .22 caliber bullets, which Curley used to shoot Hopper. *See Commonwealth v. Schrader*, Trial Ct. Slip Op., May 27, 1997, at CP–08–CR–286–1996, at 1–2. Following Schrader's arrest, he filed an omnibus pretrial motion seeking, *inter alia*, dismissal of the charges on the grounds that he had entered into a non-prosecution agreement with the Commonwealth.

After conducting an evidentiary hearing on Schrader's motion to dismiss, the trial court credited the testimony of Schrader's defense counsel, which established that District Attorney Robert Fleury [10] entered into a non-prosecution agreement with Schrader on May 5, 1995, nearly one year before Appellant's trial. The court found that the agreement provided that if Schrader would testify truthfully at Appellant's trial, District Attorney Fleury would not prosecute him for any offenses related to the instant murders. The court in *Schrader* concluded that Schrader upheld his end of the agreement by testifying against Appellant. *Id.* at 19. The court further noted that a May 5, 1995 police report prepared by Trooper Nicholas Madigan indicated that District Attorney Fleury informed Schrader that he was being interviewed as a witness in Appellant's prosecution, rather than as a suspect, and that Schrader would not be prosecuted in connection with the murders of Clark and Hopper. Accordingly, on May 22, 1997, more than one year after Appellant's trial, the trial court dismissed the charges against Schrader based on the existence of a non-prosecution agreement.[11]

10. It becomes relevant that District Attorney Fleury was the predecessor to District Attorney McGuinness, as referenced in the previous claim.

11. The trial judge who granted Schrader's motion to dismiss was the same trial judge who presided over Appellant's PCRA proceedings.

Appellant argues that the import of the trial court's finding in Schrader's case is not only the formal judicial determination that a non-prosecution agreement was entered into between the Commonwealth and Schrader one year prior to Appellant's trial, but the recognition that Schrader inculpated himself only after being explicitly advised by the Commonwealth that he would not be prosecuted. This information, Appellant maintains, should have been disclosed to him for impeachment purposes. *See Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167, 1171 (2000) (holding that "[a]ny implication, promise, or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility"). Further, Appellant submits, his trial counsel testified at his PCRA evidentiary hearing that Schrader was an important witness, that the existence of a non-prosecution agreement would have been directly relevant to Schrader's credibility, and that counsel would have used such an agreement to impeach Schrader at Appellant's trial. N.T. May 31, 2006, at 35.

The Commonwealth responds that Appellant's statement of the material facts supporting this *Brady* claim, while correct, is incomplete because, as developed *infra*, the evidence at the PCRA evidentiary hearing demonstrated that the non-prosecution agreement entered into between Schrader and the Commonwealth had been expressly revoked prior to Appellant's trial. Thus, it asserts, to determine whether there was exculpatory or impeaching evidence that the Commonwealth failed to disclose, the controlling inquiry is not whether Schrader ever entered into a non-prosecution agreement, but whether Schrader believed such agreement was valid at the time he testified against Appellant. If Schrader was unaware that the non-prosecution agreement was in effect when he testified against Appellant, the Commonwealth argues, there would be no incentive for Schrader to testify falsely against Appellant, and the fact that a trial court subsequently found that a non-prosecution agreement existed does not constitute *Brady* material. *See Commonwealth v. Pagan*, 597 Pa. 69, 950 A.2d 270 (2008) (holding that the Commonwealth did not

violate *Brady* by failing to disclose that a police officer who testified against the defendant was the subject of a police ethics investigation because there was no evidence that the officer was aware of the confidential investigation or that he testified against the defendant in hopes of favorable treatment). Thus, the Commonwealth concludes, the revoked nonprosecution agreement did not constitute exculpatory or impeachment evidence existing at the time of Appellant's trial that could have been used by the defense to impeach Schrader's testimony against Appellant.

In support of its position, the Commonwealth relies on the testimony provided by District Attorney McGuinness at Appellant's PCRA hearing. District Attorney McGuinness testified that when he assumed his role of attorney for the Commonwealth after District Attorney Fleury held that position, he personally informed Schrader, prior to Appellant's trial, that there was no binding agreement between him and the Commonwealth, that the Commonwealth would not make any offer, and that Schrader could testify as a witness for the prosecution or not, as it was his choice. N.T. Jun. 1, 2006, at 121–22. The Commonwealth argues that District Attorney McGuinness' testimony in this regard is consistent with Schrader's testimony at Appellant's trial and District Attorney McGuinness' on-the-record representation to the court at Appellant's trial, which established that there was no agreement between Schrader and the Commonwealth at that particular point in time. N.T. Apr. 3, 1996, Vol. XVII, at 68 (where District Attorney McGuinness informs the court at Appellant's trial that he personally informed Schrader, as did a trooper and investigator, that the information Schrader was about to testify to could be used against him); *id.* at 108–09 (where Schrader testifies at Appellant's trial that he is not testifying under immunity, that he understands that he could be charged for offenses related to the murders of Clark and Hopper, and that he received no promises or favors in exchange for his testimony).

The PCRA court expressly credited the testimony of District Attorney McGuinness, and found that "at the time

Schrader testified at [Appellant's] trial, the non-prosecution agreement clearly had been repudiated by the Commonwealth, whether lawfully or not, and Schrader himself acknowledged that he had no form of immunity." PCRA Ct. Opinion, Jun. 30, 2009, at 8. The PCRA court went on to state that "there is not a scintilla of evidence that when Schrader testified at [Appellant's] trial, he believed there was any promise of leniency from the Commonwealth. In short, there was no undisclosed agreement which might have impeached Schrader and no undisclosed exculpatory evidence." *Id.* at 8–9.

The PCRA court further held that, contrary to Appellant's contentions, Schrader's testimony was not critical to Appellant's prosecution because even without such testimony, "the evidence points ineluctably to [Appellant's] guilt beyond a reasonable doubt." *Id.* at 9. Thus, the court concluded that even if Appellant could establish that Schrader testified under an undisclosed non-prosecution agreement, Appellant was not prejudiced by the Commonwealth's failure to disclose the same. *Id.*

We conclude that the PCRA court's factual findings are supported by the record and its legal conclusions are free from error. There was ample evidence of record to support the finding that Schrader believed that his testimony at Appellant's trial could subsequently be used against him, and, therefore, had no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth. As noted by the Commonwealth, this was established by the testimony of District Attorney McGuinness at Appellant's PCRA evidentiary hearing, and the testimony of Schrader, himself, at Appellant's trial, as referenced above. N.T. Jun. 1, 2006, at 121–22; N.T. Apr. 3, 1996, Vol. XVIII, at 108–09. Considering that the PCRA court credited the testimony establishing that Schrader believed the non-prosecution agreement had been revoked, it strains logic to conclude that Appellant could have used such agreement to impeach Schrader's testimony to demonstrate bias on the part of Schrader. This *Brady* claim, therefore, fails.

## II. Violation of Substantive Due Process

Appellant next argues that the Commonwealth violated his right to substantive due process as guaranteed by the federal and state constitutions when it pursued a prosecution theory at his trial that was irreconcilable with the prosecution theory later pursued in Curley's penalty proceeding.[12] Specifically, he maintains, the Commonwealth informed Appellant's jury that Curley killed the victims because he was afraid that Appellant would kill him if he refused, yet later informed Curley's penalty jury that the only evidence of Appellant's threats was Curley's own testimony. Appellant further asserts that the Commonwealth argued at his trial that he used great force to "squeeze" Curley to commit the murder, yet told Curley's penalty jury that Curley was not under emotional duress at the time of the murders because Curley: had the gun, had thought about killing the victims all morning; and was alone in the garage when he shot the victims. Finally, Appellant argues that the Commonwealth informed his jury that he "solicited, commanded, encouraged, and requested William Curley to commit murder," N.T. (Appellant's Trial) Apr. 10, 1996, Vol. XXVI, at 31, yet implored Curley's penalty jury to conclude that Curley's prosecution "is a death penalty crime done by somebody who thought it would be neat." N.T. (Curley's Penalty Trial) May, 24, 1996, at 19.

In a related claim, Appellant argues that trial counsel was ineffective for failing to review Curley's "court file" prior to the commencement of Appellant's trial. He contends that review of Curley's file would have revealed the Commonwealth's inconsistent theories of prosecution, and enabled trial counsel to impeach the integrity and reliability of the Commonwealth's presentation.[13]

12. As noted, Appellant's trial commenced on March 25, 1996, and he was convicted on April 11, 1996. The penalty phase of Curley's trial began on May 20, 1996, and concluded on May 24, 1996, with the jury deadlocked as to the penalty.

13. We note that this ineffectiveness claim is, itself, facially inconsistent as Appellant faults counsel for not reviewing Curley's "court file" prior to Appellant's trial, yet relies entirely on a prosecution theory set forth at Curley's penalty trial, which occurred after Appellant's trial.

In response, the Commonwealth contends that Appellant waived his due process claim because it was not raised on direct appeal, despite the fact that Curley's sentencing phase was completed in May of 1996, long before Appellant's post-sentence motions were due. It further argues that the due process claim fails on the merits because Appellant cites no decision of this Court or the United States Supreme Court, which stands for the proposition that the Commonwealth may not pursue different prosecutorial theories in separate murder trials of codefendants. The Commonwealth views Appellant's claim as an improper request for this Court to adopt a new rule of law and apply it retroactively to his case.

Even assuming that inconsistent theories of prosecution are constitutionally prohibited, the Commonwealth submits that the theories pursued at the trials of Appellant and Curley were harmonious in that they both suggested that Curley committed the murders at Appellant's request. According to the Commonwealth, it has never denied, in any proceeding, that Appellant acted in a menacing or threatening way in coaxing Curley to kill Clark and Hopper. At Appellant's trial, the Commonwealth asserts, it emphasized the nature of Appellant's manipulative conduct and the fact that such conduct was directed towards Curley, who was only 18 years of age at the time of the offenses. At Curley's penalty trial, the Commonwealth submits, it emphasized Curley's ability to overcome Appellant's coercion and his desire to be trained as a "hit man." The Commonwealth concludes that it is not inconsistent to argue that Appellant placed Curley in the felonious situation by coercing and threatening him, and later, to assert that Curley was not compelled to heed Appellant's commands.

Finally, with respect to Appellant's derivative ineffectiveness claim, the Commonwealth argues that the claim fails for lack of arguable merit. It reiterates that, to date, neither this Court nor the United States Supreme Court has held that the Commonwealth is constitutionally prohibited from presenting different prosecutorial theories at separate trials for codefendants charged with the same murder, and counsel cannot be found ineffective for failing to assert this novel position. *See*

*Commonwealth v. Cox,* 603 Pa. 223, 983 A.2d 666, 702 (2009) (holding that counsel cannot be deemed ineffective for failing to anticipate a change in the law). The Commonwealth argues that Appellant failed to satisfy the second prong of the ineffectiveness test, *i.e.,* counsel's actions lacked an objective reasonable basis. It contends that trial counsel's failure to review transcripts from Curley's penalty proceeding was imminently reasonable because, at the time of Appellant's trial, they simply did not yet exist. Further, it asserts that at the PCRA evidentiary hearing, Appellant did not question counsel as to why he failed to review the transcript of Curley's penalty hearing and pursue the due process claim on direct appeal.[14] Lastly, the Commonwealth asserts that Appellant was not prejudiced by counsel's failure to review the transcript of Curley's penalty proceeding, as no viable claim would have resulted from such examination.

As noted, the PCRA court concluded that a review of the record revealed no inconsistencies between the Commonwealth theories set forth in the separate prosecutions of Appellant and Curley. It agreed with the Commonwealth that it was not inconsistent to argue in Appellant's trial that he solicited Curley to commit murder, yet also argue in Curley's penalty trial that Curley was not under duress and acted with free will. Accordingly, the PCRA court held that there were no resultant due process violations, which could serve as the basis for an ineffectiveness claim.

■ Initially, we agree with the Commonwealth that the substantive due process claim is waived as Appellant could have raised it on direct appeal, but failed to do so. *See* 42 Pa.C.S. § 9544(b) (providing that a PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding"). Curley's penalty pro-

14. In connection with the questioning of trial/appellate counsel regarding the previous *Brady* claim at the PCRA hearing, Appellant inquired whether counsel had reviewed Curley's "court file" prior to when Curley testified at Appellant's trial. N.T. May, 31, 2006, at 38. Trial/appellate counsel responded, "I have no recollection doing that, I don't believe that I did." *Id.* at 39.

ceeding concluded in May of 1996, and Appellant did not file his direct appeal until January of 1998. Thus, Appellant had ample time to obtain the transcript from Curley's penalty proceeding, and include a due process claim in his direct appeal based upon an alleged inconsistency in prosecutorial theories presented at Appellant's trial and Curley's subsequent penalty hearing. Appellant does not argue to the contrary, but rather maintains that his derivative ineffective assistance of counsel claim is not waived because the first opportunity for him to assert it was in his PCRA petition.

Thus, we conclude that the only viable claim is one alleging counsel's ineffectiveness for failing to review the transcripts of Curley's penalty hearing and pursue on direct appeal a claim alleging a violation of due process based on the presentation of inconsistent theories at Appellant's trial and Curley's penalty hearing.[15] We conclude that such claim lacks arguable merit because the record supports the PCRA court's conclusion that the Commonwealth's prosecutorial theories in the two proceedings were consistent—that Appellant coerced Curley to commit the murders of Clark and Hopper in order to train him to become a hit man.[16] The fact that the Commonwealth emphasized at Curley's penalty hearing that Curley could have overcome Appellant's threats and coercive behavior does not alter its prosecutorial theory with regard to both men that Curley committed the murders because Appellant told him to do so. As the underlying claim lacks arguable merit, counsel cannot be deemed ineffective for failing to raise it.

### III. Failure to Remove Juror Smith

Appellant next argues that appellate counsel, who also served as trial counsel, challenged ineffectively on direct appeal the trial court's failure to remove juror Lorraine Smith. As background information, we note that on the tenth day of Appellant's trial, a police officer testified that Appellant had

15. As noted, counsel could not have pursued the issue at trial because Curley's penalty proceeding had not yet occurred.

16. Accordingly, we need not examine whether due process is violated when the Commonwealth presents inconsistent prosecutorial theories in separate trials of defendants charged with the same murder.

previously stayed with a man named Kevin Collins,[17] who was Curley's stepfather. The next morning, Juror Smith informed the court that she knew Collins. The trial court colloquied Juror Smith in chambers, and discovered that Smith was Collins' aunt by marriage.[18] Smith indicated that although she had met Collins, she knew nothing about him, and assured the court that the relationship would not affect her ability to be a fair and impartial juror. Despite this assurance, trial counsel sought removal of Juror Smith, which the trial court denied. On direct appeal, counsel reasserted the claim and argued that the trial court erred by failing to remove Juror Smith. This Court disagreed, finding that the trial court acted within its discretion by refusing to remove Smith because the relationship between Juror Smith and Curley was attenuated, and Smith came forward to disclose the relationship and to assure the court that it would not affect her ability to act impartially. *Koehler*, 737 A.2d at 238–39.

Without citing any law or facts overlooked by appellate counsel, Appellant now argues that the manner by which appellate counsel raised the issue on direct appeal was ineffective because counsel failed to "properly raise, brief and litigate this issue under the proper constitutional standards." Initial Brief of Appellant at 41–42. He summarily concludes that counsel had no reasonable basis for failing to present adequately this claim on direct appeal, and that he was prejudiced by counsel's performance.

In response, the Commonwealth contends that this claim lacks arguable merit because Appellant fails to identify how appellate counsel's presentation of the claim was constitutionally deficient. It asserts that on direct appeal, appellate counsel invoked the Constitution, recited the proper standard of review, and set forth argument as to how the relationship between Juror Smith and Collins could have affected Smith's consideration of the evidence. The Commonwealth maintains that Appellant has failed to articulate what different course of

17. Collins did not testify at trial, but was merely referenced in a police officer's testimony.

18. Smith explained that Collins was the son of Smith's husband's sister.

action appellate counsel should have taken. Moreover, it emphasizes that because Appellant did not present at the PCRA hearing evidence of appellate counsel's thought process in presenting the claim on direct appeal, he has failed to demonstrate that counsel's stewardship during the appeal lacked a reasonable basis. Finally, as to the prejudice prong of the ineffectiveness test, the Commonwealth submits that Appellant has failed to identify a single fact omitted by counsel or a single principle of law overlooked by this Court on direct appeal, which would establish a reasonable probability that the outcome of the appeal would have been different.

The PCRA court summarily rejected this claim, holding that Appellant failed to satisfy his burden of demonstrating ineffectiveness because he failed to produce evidence that counsel's chosen course of action lacked a reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. Similarly, finding that Appellant had failed to explore appellate counsel's reasoning at the PCRA hearing, the court concluded that he had not overcome the presumption that appellate counsel provided effective representation.

We agree with the PCRA court that Appellant is not entitled to relief on this stand-alone claim of appellate counsel's ineffectiveness.[19] To succeed on such a claim, a PCRA petitioner must demonstrate that appellate counsel was ineffective in the manner by which he litigated the claim on appeal. *Paddy*, 15 A.3d at 443; *see also id.* at 476, (C.J. Castille, Concurring) (asserting that "[t]o prevail [on a stand-alone claim of appellate counsel ineffectiveness], the PCRA petitioner must show exactly how appellate counsel was ineffective, by offering additional evidence or controlling authority, missed by direct appeal counsel, that would have changed

---

**19.** A claim of appellate counsel ineffectiveness for failing to raise a claim of trial counsel ineffectiveness is distinct from the instant stand-alone claim of appellate counsel ineffectiveness grounded in the manner in which appellate counsel litigated a claim on appeal. *Commonwealth v. Paddy*, 609 Pa. 272, 292, 15 A.3d 431, 443 (2011). In the former case, the claim of trial counsel ineffectiveness has been waived as appellate counsel failed to raise it, but in the latter case, the underlying claim has been previously litigated as appellate counsel raised the issue, but allegedly did so ineffectively. *Id.*

the appeal outcome; or by specifically alleging the winning claim or distinct legal theory that appellate counsel failed to recognize; and then by showing how the appeal, as pursued, was incompetent by comparison"). Here, Appellant fails to demonstrate how appellate counsel's presentation of the claim on direct appeal was constitutionally deficient. Absent such showing, he has failed to demonstrate the arguable merit of his ineffectiveness claim, and is not entitled to relief. *See Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 25 (2008) (rejecting stand-alone claim of appellate counsel ineffectiveness on the ground that the appellant did not demonstrate how appellate counsel's performance on direct appeal was defective pursuant to the requirements of *Strickland/Pierce*). Accordingly, Appellant's ineffectiveness claim fails.

### IV. Failure to Remove Juror Schwartz

Appellant argues that trial counsel was ineffective for failing to challenge the trial court's refusal to dismiss Juror Mary Ann Schwartz for cause. The record establishes that after serving as an alternate juror for several days of Appellant's trial, Mary Ann Schwartz informed the court that she had a disturbing feeling that, nearly a year before, she may have seen Appellant in a car at a gas station with another adult male and a young boy, and remembers wondering why the child was not in school. *See* N.T. March 28, 1996, Vol. IX, at 1–9. Such observation was not related in any way to the instant murders.[20] The trial court asked Schwartz whether her purported observation would affect her ability to serve fairly and confidently as a juror. *Id.* at 4. While Schwartz initially responded that she was not sure, *id.*, she ultimately concluded that her disturbing feeling about a previous observation had no bearing on her belief concerning whether Appellant was guilty of the offenses charged. *Id.* Schwartz reaffirmed that her feelings would not affect her ability to perform

---

20. According to Appellant, Schwartz informed the trial court that she observed Appellant with the "young victim shortly before his death." Initial Brief of Appellant at 43. A review of the trial transcript, however, reveals that Schwartz never stated that the child she observed with Appellant was the same boy he later had murdered. *See Id.* at 1–9.

her role as a juror, *id.* at 6–7, and that she could decide the case only on the evidence presented in the courtroom. *Id.* at 8.

After the court, the Commonwealth, and trial counsel each questioned Schwartz about her alleged observation and her ability to serve as a juror, the trial court ruled that there was no reason to remove her from the jury. *Id.* at 10. The court found there was nothing in Schwartz's testimony to suggest that she was unable to be a fair, impartial, and competent juror. Neither party objected to the court's ruling, and trial counsel did not pursue the issue on direct appeal.

Appellant now argues that his claim of trial counsel ineffectiveness has arguable merit because the trial court's failure to dismiss Schwartz for cause deprived him of due process and a fair trial by an impartial jury. He submits that although Schwartz ultimately indicated that she would not be affected by her disturbing recollection, a review of the colloquy demonstrates the contrary. *See* Initial Brief of Appellant at 45 (citing *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) for the proposition that when reviewing the propriety of a denial of a challenge for cause the court inquires whether the juror swore that he could set aside any opinion that he might hold and decide the case on the evidence, and whether the juror's protestations of impartiality should be believed). Regarding the reasonable basis prong of the ineffectiveness test, Appellant asserts, without elaboration, that counsel "could have had no reasonable basis for failing to adequately raise and preserve this issue." Initial Brief of Appellant at 45. In a similar fashion, he baldly asserts that he was prejudiced by trial counsel's performance because there is nothing more fundamental than an accused's right to a fair and impartial jury.

The Commonwealth responds that Appellant's claim lacks arguable merit because the trial court questioned Schwartz regarding whether she could base her verdict solely on the evidence, and she responded in the affirmative. It submits that despite this representation, Appellant claims that the trial court should have presumed that Schwartz could not act

impartially. The Commonwealth further maintains that because Appellant did not question trial counsel at the PCRA evidentiary hearing as to why he failed to object to the trial court's refusal to dismiss Schwartz for cause, he has failed to demonstrate the reasonable basis prong of the ineffectiveness test. Finally, it argues that Appellant has failed to demonstrate that he was prejudiced by trial counsel's failure to lodge an objection, and make this an appellate issue. The Commonwealth submits that when Schwartz was questioned by the trial court she was an alternate juror, and there is no indication in the record that she was ever substituted as a juror who participated in the deliberations and voted on the ultimate verdict. Thus, it concludes, Appellant could not have been prejudiced by the trial court's failure to dismiss her for cause.

The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness. It held that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal. *Id.* at 6.

We agree that Appellant is not entitled to relief. "The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor." *Commonwealth v. Cox,* 603 Pa. 223, 983 A.2d 666, 682 (2009) (citing *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 299 (1996)). The decision of whether to disqualify a juror is within the discretion of the trial court and will not be reversed in the absence of an abuse of discretion. *Id.* Here, the record supports the trial court's initial finding that Schwartz was able to set aside her recollection of observing Appellant in the past, and base her verdict on the evidence. Thus, the trial court did not err in failing to dismiss her for cause, and trial counsel cannot be deemed

ineffective for failing to pursue a meritless claim. *See Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125, 1156 (2009) (holding that counsel cannot be deemed ineffective for failing to raise a meritless claim).

## V. Prosecutorial Misconduct

Appellant argues that trial counsel was ineffective for failing to object to pervasive prosecutorial misconduct that occurred during opening statements, at trial, during closing arguments, and throughout the penalty phase of trial, and for failing to request a cautionary instruction directing the jury to disregard each of the prosecutor's allegedly improper statements and his improper conduct.[21] He contends that the instances of prosecutorial misconduct enumerated below, both individually and collectively, violated his constitutional rights.

 Before elaborating on the specifics of Appellant's claim, we recognize that a claim of ineffective assistance grounded in trial counsel's failure to object to a prosecutor's conduct "may succeed when the petitioner demonstrates that the prosecutor's actions violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process." *Cox,* 983 A.2d at 685 (quoting *Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 29 (2008)). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 685 (quoting *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (internal quotation marks omitted)). "The touchstone is fairness of the trial, not the culpability of the prosecutor." *Id.* Finally, "[n]ot

21. To the extent Appellant argues the substantive claim of prosecutorial misconduct, as opposed to the ineffectiveness of counsel claim premised upon the same underlying incident, this claim is waived because trial counsel did not lodge a contemporaneous objection when any of the alleged instances of misconduct occurred. *See* 42 Pa.C.S. § 9544(b) (providing that a claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding").

every intemperate or improper remark mandates the granting of a new trial;" *id.*, "[r]eversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Id.*

In an effort to demonstrate the arguable merit of the ineffectiveness claim as it relates to trial counsel's failure to object to alleged prosecutorial misconduct that occurred during opening statements, Appellant contends that the prosecutor's comments: (1) "set a tone of drama, passion, and prejudice against [him]," Initial Brief for Appellant at 46; (2) referenced improperly the emotional impact the crimes had on the victims' family members and the investigators who recovered the victims' bodies; and (3) vouched improperly for the character of the prosecution witnesses.

To establish the arguable merit of his ineffectiveness claim relating to trial counsel's failure to object to the alleged prosecutorial misconduct that occurred during the trial, Appellant submits that the prosecutor: (1) "intentionally elicited the emotional impact of the crimes on various witnesses in a blatant attempt to inflame the passions of the jury;" *Id.* at 49; (2) presented irrelevant evidence to garner sympathy for prosecution witnesses; (3) exceeded the limitations placed on the admission of other crimes evidence; and (4) presented false and misleading testimony with respect to the agreements the Commonwealth had entered into with prosecution witnesses Bill Curley and Kirk Schrader.

To demonstrate the arguable merit of his ineffectiveness claim relating to trial counsel's failure to object during closing argument, Appellant contends that the prosecutor: (1) personally attacked defense counsel; (2) expressed his personal opinion regarding the evidence and the veracity of witnesses; and (3) misrepresented trial evidence. Finally, relevant to the arguable merit of the ineffectiveness claim as it relates to trial counsel's failure to object to prosecutorial misconduct in the penalty phase, Appellant maintains that the

prosecutor: (1) argued in favor of the death penalty by relying on non-statutory factors; and (2) misstated the law during closing arguments.

Proceeding to the reasonable basis prong of the ineffectiveness test, Appellant generically asserts, in relation to all of the claims of prosecutorial misconduct in the aggregate, that "[t]rial counsel could have had no reasonable basis for failing to object and seek corrective measures from the court." *Id.* at 54. Significantly, he does not explain what particular corrective measures should have been sought to remedy each individual instance of purported prosecutorial misconduct. Presumably ignoring that he has already had an evidentiary hearing, and chose not to question trial counsel regarding these claims, Appellant states, "[a]ny suggestion that counsel's inaction was the product of reasonable strategy rather than mistake or neglect should be resolved after a hearing." *Id.* at 55.

Finally, regarding the prejudice prong of the ineffectiveness test, Appellant's entire analysis is as follows:

> Had counsel objected, there is a reasonable likelihood that the court would have sustained the objections and cautioned the jurors to disregard the prosecutor's comments. Instead, trial counsel's failure to do so allowed the comments to go unchecked. The comments prejudiced Appellant; but for counsel's inaction, there is a reasonable likelihood that the outcome of the trial would have been different.

*Id.* at 55.

In response, the Commonwealth addresses the arguable merit of each alleged incident of prosecutorial misconduct, and concludes, after thoughtful analysis, that none of statements of the prosecutor amounted to prosecutorial misconduct. It argues that Appellant also failed to demonstrate the "unreasonable act or omission" prong of the ineffectiveness test because he failed to introduce evidence of counsel's thought process regarding this claim. The Commonwealth emphasizes that a PCRA petitioner has the burden of proving each element of a claim of ineffective assistance of counsel, and that Appellant's

failure to examine trial counsel's reasoning, when afforded an opportunity to do so, is fatal to his claim.

The PCRA court did not address the arguable merit of this claim, but rejected it, as it did various other claims, on the grounds that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. *See* PCRA Ct. Opinion, Dec. 30, 2009, at 1. Like the Commonwealth, the court emphasized that it is the petitioner's burden to prove all three prongs of the ineffectiveness standard and that Appellant failed to satisfy this burden. Finally, it noted that Appellant failed to establish that direct appeal counsel[22] lacked a strategic basis for choosing to forego the claims identified in the PCRA petition.

Upon review of the record, we find support for the PCRA court's conclusion that Appellant failed to demonstrate that trial counsel lacked a reasonable basis for failing to lodge objections and/or seek cautionary instructions relating to each instance of purported prosecutorial misconduct.[23] As noted, this is not a case of summary dismissal of PCRA relief; rather an evidentiary hearing was conducted and Appellant was afforded the opportunity to present evidence in support of all of his claims. Nevertheless, Appellant posed no questions to trial counsel relating to any allegations of prosecutorial misconduct, and the lack of a strategic basis for failing to object is not self-evident.

Appellant attempts to overcome his failure to elicit trial counsel's thought process regarding this particular claim by emphasizing trial counsel's general PCRA hearing testimony that he had no strategic purpose for failing to raise meritori-

22. We reiterate, however, that because Appellant was represented by the same counsel at trial and on direct appeal, he could not raise his own ineffectiveness on direct appeal.

23. We further note that trial counsel raised three claims of prosecutorial misconduct at trial that are unrelated to Appellant's current claims of prosecutorial misconduct, and pursued those claims on direct appeal. *See Koehler,* 737 A.2d at 240–41. Appellant does not discuss why it was unreasonable for trial counsel to pursue those claims, as opposed to the claims of prosecutorial misconduct proffered herein.

ous claims on appeal. *See* N.T. May, 31, 2006, at 50 (wherein trial counsel testifies that his general appellate practice was to raise any issue on appeal "that might well be viable."). Trial counsel's general appellate practice, however, sheds no light on the only relevant inquiry of whether trial counsel acted reasonably by failing to lodge objections and/or seek cautionary instructions at trial for each of the several alleged instances of prosecutorial misconduct.

This Court has recognized that "[c]ounsel are not constitutionally required to forward any and all possible objections at trial, and the decision of when to interrupt oftentimes is a function of overall defense strategy being brought to bear upon issues which arise unexpectedly at trial and require split-second decision-making by counsel." *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 832 (2005). Under some circumstances, trial counsel may forego objecting to an objectionable remark or seeking a cautionary instruction on a particular point because "[o]bjections sometimes highlight the issue for the jury, and curative instructions always do." *Id.*

Our recent decision in *Lesko* illustrates this point. There, the PCRA petitioner contended that trial counsel was ineffective for failing to request an appropriate limiting instruction when the trial court admitted evidence of the petitioner's prior bad acts.[24] In rejecting the claim, we recognized that "[i]t is well settled that the decision whether to seek a jury instruction implicates a matter of trial strategy." *Id.* at 401 (citations omitted). Because Lesko was given an evidentiary hearing and yet did not elicit from trial counsel his reasons for failing to request the cautionary charge, we concluded that Lesko failed to sustain his burden of demonstrating a lack of reasonable basis. *Id.* We held that because Lesko did not establish any ground for deeming counsel *per se* ineffective, and did not establish a lack of reasonable basis through trial counsel's testimony at the PCRA hearing, he failed to sustain his

24. In *Lesko,* the admissibility of the prior bad acts evidence at issue was litigated on direct appeal; thus, the ineffectiveness claim raised in the PCRA petition focused solely on trial counsel's failure to request a cautionary instruction.

burden of proof. *Id. See also Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 278 (2008) (rejecting ineffectiveness claim because, *inter alia*, PCRA counsel failed to question trial counsel during the PCRA hearing regarding his trial strategy for not calling a particular witness); *Commonwealth v. Ervin*, 766 A.2d 859 (Pa.Super.2000) (rejecting claim challenging trial counsel's failure to object to the prosecutor's questioning and argument on the reasonable basis prong of the ineffectiveness test because the PCRA petitioner was afforded an evidentiary hearing, but failed to question trial counsel regarding his trial strategy as it related to the claim of ineffectiveness). As in *Lesko*, Appellant has failed to satisfy his burden of proof, and the ineffectiveness claim fails.[25]

## VI. Failure to Present Mitigation Evidence

Appellant next argues that trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence during the penalty phase of trial. He maintains that his claim has arguable merit because counsel failed to present available evidence establishing that Appellant had a history of family abuse and neglect, and suffered from the psychological disorders of personality disorder (not otherwise specified) and attention deficit-hyperactive disorder ("ADHD"). Appellant submits that rather than presenting this persuasive evidence of mitigation, trial counsel presented only the testimony of Appellant's mother, which spanned a sparse five pages of transcript. *See* N.T. Apr. 12, 1996, at 21–25. Appellant's mother testified that she and Appellant's father divorced when Appellant was seven years old; she worked two jobs trying to make ends meet; her ex-husband was abusive to Appellant when she was not at home; and, because of her work schedule, she did not see Appellant or his sisters very much. *Id.*

---

**25.** Moreover, Appellant has not shown a reasonable probability that the outcome of the sentencing proceeding would have differed had trial counsel objected and/or sought a cautionary instruction regarding any one of the many alleged instances of prosecutorial misconduct. Considering the overwhelming evidence of Appellant's guilt as demonstrated primarily by the testimony of Curley and Schrader, Appellant's generic claim of prejudice is insufficient to address the myriad of sub-issues alleging prosecutorial misconduct.

Appellant maintains that trial counsel likewise gave a sparse and unconvincing closing argument, requesting only that the jury consider that Appellant grew up on his own without the care of his father, and while his mother continually worked to pay the bills. *Id.* at 32–36.[26]

In support of his claim that trial counsel overlooked available evidence of neglect and abuse, Appellant relies on the testimony provided at the PCRA evidentiary hearing by his sister, Tracy Glover, and Glover's childhood friend, Joanne Budinas. Glover testified that her parents fought "all the time," and that sometimes it would "get physical." N.T. May 31, 2006, at 28. She stated that the fights were "very scary," *id.*, and that she would suffer panic attacks after witnessing them. *Id.* at 29. Glover explained that her father was often drunk when the fights occurred, and that he would discipline the children by beating Appellant and his sisters with belts and his hands. *Id.* at 31–32. She testified that the family could not afford a car or a telephone, and did not always have food in the house. *Id.* at 36–37.

Glover's childhood friend, Joanne Budinas, corroborated Glover's testimony by asserting that she observed "screaming matches" between Appellant's parents. *Id.* at 15. Budinas also saw the bruises on Glover's back and legs, resulting from her father's beatings when she was a child. *Id.* at 16. She testified that Appellant's home life was unstable and lacked nurturing because the family frequently moved and the homes in which the family lived were always in disarray, and often without utilities due to non-payment. *Id.* at 10, 12, & 13.

In support of his claim that trial counsel overlooked available evidence of Appellant's psychological disorders, Appellant relies on the testimony provided at the PCRA evidentiary hearing by Dr. Edward Dougherty. Dr. Dougherty opined that instability and neglect impacted Appellant's identity and personality, and caused him to develop an "avoidant" method of coping. These conditions, he explained, contributed to

26. Counsel also advocated in his closing argument at the penalty hearing that a mitigating circumstance existed because Appellant did not pull the trigger and actually kill the two victims.

Appellant developing features of personality disorder (not otherwise specified) and borderline anti-social features, which affected Appellant's ability to function and relate to others. *Id.* at 119–20. Dr. Dougherty also opined that Appellant has an impulsive disorder brought on by the stress of his family background, *id.* at 115, and suffers from ADHD, which affects the executive functioning area of the brain, making him impulsive and unable to consider fully and appreciate the consequences of his actions. *Id.* at 220. He also explained that Appellant had a history of alcohol abuse, beginning at age 15. *Id.* at 103. Appellant contends that without the testimony of a mental health expert such as Dr. Dougherty, the jury was left with no means of understanding his character and the disorders that led to his significant impairment.

As to the second prong of the ineffectiveness test, Appellant argues that counsel's deficient performance had no reasonable strategic basis, as the penalty phase was an afterthought to trial counsel, who explained that his primary focus was on the guilt phase. *Id.* at 5. He emphasizes that trial counsel acknowledged that he focused on the guilt phase until "right up to trial," and never had Appellant evaluated by a mental health professional. *Id.* at 10, 17. According to Appellant, this constitutes constitutionally deficient performance. *See Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (providing that counsel's actions "fell short of professional standards" when, *inter alia,* counsel "did not even begin to prepare for [penalty phase] until a week before trial"). He contends that counsel's reliance upon his own lay diagnoses of Appellant's mental health was misguided and did not meet the standard of practice of a defense attorney in a capital case. *See Rompilla v. Beard,* 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (quoting ABA STANDARD 4–4.1 (2d ed.1982 Supp.)) (providing that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."); *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 582 (2005) (providing that a failure by trial counsel to

investigate potential mitigating evidence cannot be considered strategic where counsel has failed to conduct even a cursory review of the defendant's background). Here, Appellant contends, trial counsel not only failed to conduct a cursory review; he failed to conduct any review at all.

Finally, Appellant contends that the third prong of the ineffectiveness test is satisfied because he was prejudiced by counsel's failure to investigate reasonably and present available life history information, and to provide such information to a mental health expert who could offer a professional opinion regarding how the life history impacted Appellant's behavior. According to Appellant, "[i]nformation about [Appellant's] personality disorder and ADHD, presented to the jury by a qualified mental health expert, would have been highly mitigating, as would the information that [Appellant's] traumatic childhood damaged his psyche and brought about his disorders. The jury learned little or nothing about [Appellant] before deciding on a sentence of death." Initial Brief of Appellant at 69. Appellant concludes that he has demonstrated prejudice because it is reasonably likely that such evidence could have swayed one juror that a life sentence was more appropriate, and that the outcome of the penalty hearing would have been different.

In denying relief on this claim, the PCRA court held that "although trial counsel admittedly devoted little time to developing mitigation evidence and presented little evidence at the penalty phase, there is in fact virtually no mitigation evidence available for [Appellant]." PCRA Ct. Opinion, Jun. 30, 2009, at 9. It stated:

> The PCRA testimony of Defendant's expert witness, Dr. Edward Dougherty, was so masterfully dissected by the attorney for the Commonwealth as to render it weightless even before it was soundly contradicted by the Commonwealth's expert.[27] It is not likely that Dr. Dougherty's

27. The Commonwealth meticulously reviewed with Dr. Dougherty Appellant's planning, execution, and cover-up of the murders, and questioned Dr. Dougherty regarding whether such acts were characteristic of a person that has difficulty staying on task and completing an

testimony would have benefitted [Appellant]. Indeed, if a jury would conclude, as this court has, that Dr. Dougherty was reaching, his testimony might be damaging to [Appellant].

*Id.* at 9–10. The PCRA further opined that the "more detailed and anecdotal" testimony of Tracy Glover and Joanne Budinas was cumulative of the evidence already presented at Appellant's penalty phase trial. *Id.* at 10. The court concluded that "[s]urely it would not be lost on a jury that, as difficult as [Appellant's] childhood may have been, he was not murdered at age 9 for being a 'loose link' [as was Hopper in the instant case]." *Id.*

The Commonwealth argues that the PCRA court's conclusions are supported by the record and free of legal error. It contends that Appellant's claim fails for lack of arguable merit because it is premised almost entirely on the testimony of his own mental health expert, which the PCRA court expressly rejected as unworthy of belief. The Commonwealth also argues that the remaining mitigation evidence of Appellant's life history proffered by Glover and Budinas was either cumulative of that presented at Appellant's penalty trial or was irrelevant, as it related to incidents involving Appellant's sister, and not Appellant himself. It also submits that Appellant has failed to introduce evidence of trial counsel's thought process regarding this claim, and thereby failed to demonstrate the second prong of the ineffectiveness test, *i.e.*, that trial counsel lacked a reasonable basis for presenting only the mitigation evidence that was admitted at trial.[28] Finally, the Commonwealth argues that Appellant has not satisfied the third prong of the ineffectiveness test because he failed to demonstrate that he was prejudiced by trial counsel's stewardship during the penalty phase of trial.

assignment, which are attributes of ADHD. *See e.g.* N.T. May 31, 2006, at 194–99.

**28.** Appellant, however, questioned trial counsel at the PCRA evidentiary hearing regarding how he prepared for the penalty phase of trial and how much time he devoted to such task. *See* N.T. May 31, 2006, at 5–24.

■ "In evaluating a claim of constitutional deficiency in investigating and presenting mitigating evidence, we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented." *Lesko,* 15 A.3d at 380. "None of these factors, however, is by itself dispositive, because even if the investigation by counsel was unreasonable, this fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct." *Id.*

■ We begin by assuming for purposes of argument that Appellant has demonstrated the arguable merit of his ineffectiveness claim, and that trial counsel lacked a reasonable strategy in presenting a single mitigation witness, whose scant testimony revealed only that Appellant's childhood was less than ideal. It is clear that trial counsel's efforts were focused primarily on the guilt phase of trial, notwithstanding that Appellant faced two sentences of death in the penalty phase. Even assuming, however, that trial counsel's stewardship was constitutionally deficient, we have no hesitation concluding that Appellant has failed to demonstrate that he was prejudiced by trial counsel's regrettable performance in this regard. *See Lesko,* 15 A.3d at 374 (providing that if a claim fails under any element of the ineffectiveness test, the court may proceed to that element first).

■ To demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different. *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 788 (2004) (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The United State Supreme Court recently explained in *Sears v. Upton,* —— U.S. ——, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010), that to assess the probability of a different outcome under *Strickland,* we consider the totality of the available mitigation evidence adduced both at trial and on collateral review, and reweigh such

mitigation evidence against the evidence in aggravation. *Sears*, at 3266; *see also Commonwealth v. Gibson*, 610 Pa. 332, 19 A.3d 512, 526 (2011) (holding that in making the ultimate prejudice assessment, we reweigh the evidence in aggravation against the totality of available mitigating evidence, which includes the evidence presented at the penalty hearing and the evidence that would have been presented had counsel conducted a proper investigation). This Court has recognized that such reweighing of mitigating and aggravating evidence is not an exact science, as a reviewing court cannot determine with certainty how the jury would have evaluated testimony it never heard. *Id.* "Nevertheless, we can evaluate the relative strength of the aggravation and mitigation, as well as the parties' arguments in light of the full record." *Id.*

Considering the full record before us, it is not probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the Commonwealth's aggravating circumstances had the juror been aware of the mitigation evidence proffered at the PCRA hearing. *See Wiggins*, at 537, 123 S.Ct. 2527 (standard for assessing prejudice from deficient stewardship in presentation of mitigating evidence is whether "there is a reasonable probability that at least one juror would have struck a different balance."). As recognized by the PCRA court, the mitigation evidence presented at the PCRA hearing was far from compelling. Instead, the bulk of the mitigation evidence presented, *i.e.*, Dr. Dougherty's testimony demonstrating that Appellant manifested features of a personality disorder and suffered from ADHD, was expressly rejected as unworthy of belief by the PCRA court. A review of the Commonwealth's cross-examination of Dr. Dougherty sheds light on why the PCRA court rendered the testimony "weightless." PCRA Ct. Opinion, Jun. 30, 2009, at 9. The Commonwealth effectively cross-examined Dr. Dougherty by reiterating Appellant's meticulous planning, execution, and cover-up of the murders, and questioning the mental health expert regarding whether such acts were consistent with characteristics of a person who suffers from ADHD, and thereby has difficulty staying on task and

completing an assignment. *See* N.T. May 31, 2006, at 194–99. Also on cross-examination, the Commonwealth challenged Dr. Dougherty's finding that Appellant manifested features of a personality disorder, and led Dr. Dougherty to acknowledge that he could not provide a definitive diagnosis of that particular impairment. *Id.* at 164. Because the record supports the PCRA court's conclusion that the jury would not have given much, if any, weight to Dr. Dougherty's testimony, we defer to that determination.

We next examine the life history evidence of mitigation presented by Appellant's sister and his sister's childhood friend. This evidence was informative as it illustrated effectively that Appellant was neglected and abused as a child, having been raised in an environment lacking supervision, stability, and love. While the scant testimony of Appellant's mother at Appellant's penalty trial touched upon these issues, the testimony presented at the PCRA hearing by Glover and Budinas contained much more detail and painted a clearer picture of Appellant's unfortunate childhood. Such evidence, however, pales in comparison with the aggravating circumstances found by the jury. As noted, in relation to Appellant's conviction of the first degree murder of Clark, the jury found the aggravating circumstance of conviction of another murder either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). This Court has recognized the substantial strength of the aggravating circumstance of multiple murders in determining prejudice allegedly suffered by counsel's failure to present sufficient mitigation evidence. *Lesko*, 15 A.3d at 385 (emphasizing the strength of the aggravating circumstance that defendant committed multiple murders within a one-week period in connection with a claim challenging counsel's effectiveness for failing to present mitigation evidence); *Cox*, 983 A.2d at 697 (providing that where the defendant is responsible for multiple murders, he has greater difficulty in securing *Strickland* relief premised on foregone, supplemental mitigation evidence). Based on the entirety of the record, we likewise conclude that the mitigation evidence of Appellant's unfortunate childhood is clearly outweighed by the aggrava-

ting circumstance of senseless multiple murders of two innocent victims in a bizarre exercise to train another individual to become an assassin.

We reach the same conclusion regarding the weighing of aggravating and mitigating evidence relating to Appellant's conviction of the first degree murder of Clark's nine year-old son, Hopper. Concerning that conviction, the jury found two aggravating circumstances, including conviction of another murder, and that the victim was less than twelve years' old. 42 Pa.C.S. § 9711(d)(16). The fact that the second victim was a defenseless child weighs far heavier in aggravation. Accordingly, we reach the inescapable conclusion that there is no reasonable probability that one juror would have struck a different balance and voted not to impose the death penalty for Hopper's murder if he or she had heard the more detailed life history mitigation evidence set forth at the PCRA hearing. Appellant is therefore not entitled to relief on this claim.

## VII. Kerrien Ramsey's Invocation of Fifth Amendment

Appellant contends that appellate counsel litigated ineffectively a claim on direct appeal, which related to the testimony of Commonwealth witness Kerrien Ramsey. As noted, Ramsey testified at Appellant's trial that when she was travelling with Appellant, Clark, and Hopper shortly before the murders, Appellant showed Ramsey a loaded gun, and told her he was going to kill Clark. On cross-examination,[29] in an effort to demonstrate that her ability to interpret the events was impaired, trial counsel inquired whether Ramsey had ever used the drug crystal methamphetamine during her travels with Appellant and the victims. At that point, Ramsey invoked her Fifth Amendment right against self-incrimination. N.T. Apr. 2, 1996, Vol. XIV, at 42. The trial court thereafter cautioned trial counsel that to be relevant, his questioning of Ramsey regarding her drug use had to be limited to a specific time to which she testified on direct examination.

**29.** This cross-examination occurred without the jury present to allow trial counsel to determine which part of Ramsey's testimony would be admissible.

On direct appeal, counsel forwarded the argument that the trial court erred by limiting its cross-examination of Ramsey. Finding that Appellant made "little argument on this claim in his brief," *Koehler*, 737 A.2d at 239, our Court held that the claim was meritless because, "while a witness may be questioned about drug or alcohol abuse at the time of the events about which he or she is testifying, questions about a witness's drug use at a time other than the time about which the witness is testifying are not permitted." *Id.* The opinion on direct appeal did not describe the claim as involving an improper invocation of the Fifth Amendment.

Appellant now contends that appellate counsel was ineffective in the manner by which he litigated the claim on direct appeal. He argues that his claim possesses arguable merit because appellate counsel failed to argue that the trial court erred by allowing Ramsey to invoke her Fifth Amendment right to self-incrimination absent a determination by the court that she faced "substantial and real" hazards of incrimination. *See* Initial Brief for Appellant at 72 (citing *Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) for the proposition that a witness's mere unwillingness to testify is inadequate to sustain a Fifth Amendment claim in the absence of a determination by the court that substantial and real hazards of incrimination exist). He argues that requiring Ramsey to answer the question about whether she used crystal methamphetamine during the trip with Appellant and the victims would have caused the jury to question Ramsey's ability to perceive accurately the events to which she testified. Appellant concludes that the trial court's decision permitting Ramsey to invoke the Fifth Amendment violated his right to due process, a fair trial, and his right to confrontation. He summarily asserts that appellate counsel could have had no reasonable basis for failing to preserve the issue, and that this failure constituted prejudicial deficient performance.

In response, the Commonwealth maintains that the ineffectiveness claim lacks arguable merit because the trial court did not err in permitting Ramsey to invoke the Fifth Amendment

when asked whether she used illegal drugs while travelling with, among others, the child victim in this case. It argues that Ramsey's testimony could have potentially subjected her to various criminal charges such as possession of a controlled substance, corruption of minors, and endangering the welfare of children. The Commonwealth additionally asserts that because Appellant did not question trial/appellate counsel regarding this claim at the PCRA evidentiary hearing, he has failed to demonstrate that counsel lacked a reasonable basis in failing to include this issue among those raised on direct appeal.

The PCRA court did not address the arguable merit of this claim, but summarily rejected it, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness. It emphasized that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal. *Id.* at 6.

The record supports the PCRA court's conclusion that Appellant had the opportunity to question counsel regarding why he failed to purse the Fifth Amendment claim on direct appeal, but asked counsel no questions relating to this allegation of ineffectiveness. Nevertheless, we reject the ineffectiveness claim for lack of arguable merit, as Ramsey clearly could have subjected herself to criminal liability by responding to questions concerning whether she used illegal drugs on her travels with Appellant and the victims. In fact, prior to her testimony on cross-examination, the trial court expressly cautioned Ramsey that she was going to be asked about her illegal drug use, and informed her that she had a Fifth Amendment privilege to refuse to testify about those matters. N.T. Apr. 2, 1996, Vol. XIV, at 2–3. Thus, Appellant is not entitled to relief on this claim because Ramsey had a reasonable basis for believing that her response would be incriminating. *See Commonwealth v. McGrogan*, 523 Pa. 614, 568 A.2d

924, 930 (1990) (holding that the privilege against self-incrimination prevents an individual from providing evidence which may lead to his own prosecution and may be invoked by an individual who has a reasonable basis for believing his testimony will be incriminatory).

## VIII. Instruction on Specific Intent to Kill

Appellant contends that trial counsel was ineffective for failing to object when the trial court erroneously instructed the jury that it could infer his specific intent to kill from the actions of his accomplice, Curley, thereby relieving the Commonwealth of its burden of proving all elements of first degree murder. He relies on *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994), where this Court found reversible error where the instruction suggested that the jury could find that the defendant possessed the specific intent to kill requisite for a first degree murder conviction based solely on an act of his accomplice.[30] We clarified in *Huffman* that the Commonwealth must prove beyond a reasonable doubt that the defendant independently possessed the requisite specific intent to kill, and that the same could not be proven by evidence of the intent to kill possessed by the defendant's accomplice or co-conspirator. In support of his underlying claim of a *Huffman* violation, Appellant cites the following charge given to his jury:

> When deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind. If you believe that the defendant *or an accomplice or co-conspirator* intentionally used a deadly weapon on a vital part of the victim's body,

**30.** The charge found improper in *Huffman* stated:
> Thus, in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.
>
> *Id.* at 962.

you—you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill.

N.T. Apr. 11, 1996, Vol. XXVII, at 29 (emphasis added).

Appellant concludes that, pursuant to this instruction, the jury could have improperly inferred that he had the specific intent to kill based solely on the fact that Curley possessed such intent. He maintains that because this Court's decision in *Huffman* was published two years prior to his trial and expressly prohibited the charge given to his jury, trial counsel could have had no reasonable basis for failing to object.[31] Appellant further concludes that "prejudice here is manifest; an instruction which lessens the prosecutor's burden of proof regarding a critical element of the crime of First Degree Murder is inherently prejudicial." Initial Brief of Appellant at 77.

The Commonwealth responds that this issue is controlled by our Court's decision in *Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409 (2009). In *Daniels*, we held that the PCRA petitioner was not prejudiced by counsel's failure to challenge the trial court's specific intent to kill instructions, even though an isolated portion of the charge appeared to have violated the ruling in *Huffman*.[32] We reasoned that, when read in its

---

**31.** While Appellant did not question trial counsel at the PCRA evidentiary hearing as to why he did not challenge at trial the accomplice liability jury instruction on grounds that it violated *Huffman*, he did ask counsel why he failed to raise the issue on appeal. N.T. May 31, 2006, at 49. As noted, counsel responded that he had no recollection of any aspects of the appeal. *Id.*

**32.** The trial court in *Daniels* charged the jury as follows:

Thus, in order to find a Defendant guilty of murder of the first degree, you must find that the Defendant caused the death of another person or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or an accomplice's or co-conspirator's act is the legal cause of the death of [the victim] and thereafter you must determine if the killing was intentional.

*Id.* at 429. The PCRA court in *Daniels* found that this instruction was erroneous and that trial counsel was ineffective for failing to object because the instruction failed to inform the jury that the Commonwealth must establish beyond a reasonable doubt that an accomplice to

entirety, the instruction informed the jury that the defendant must possess the specific intent to kill. Relying on our previous decision in *Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450 (2004), we held in *Daniels* that when reviewing *Huffman*-type challenges, courts should examine the challenged jury charge in its entirety, placing particular importance on whether the jury was adequately apprised of the elements of first degree murder and the related concept of specific intent to kill. *Id.* at 430–31. Applying such framework, the Court in *Daniels* held that while the excerpt of the jury instruction quoted by the petitioner was problematic and in tension with *Huffman* if viewed in isolation, when reviewed in its entirety, the court correctly charged on accomplice liability, the elements of first degree murder, the Commonwealth's burden of proving every element of the crime beyond a reasonable doubt, and, significantly, that the defendant must possess the specific intent to kill.

As in *Daniels*, the Commonwealth submits, the trial court below correctly charged the jury on accomplice liability and the law of criminal conspiracy, N.T. Apr. 11, 1996, Vol. XXVII, at 19–21, as well as the elements of first degree murder, including that the defendant must possess the specific intent to kill. *Id.* at 28–29. Further, the Commonwealth asserts, the jury charge informed the jury that the Commonwealth bore the burden of proving beyond a reasonable doubt each element of the crime charged. *Id.* at 2, 3. Thus, it concludes that because the charge, when viewed as a whole, instructed the jurors that Appellant must independently possess the specific intent to kill, Appellant's ineffectiveness claim fails.

The PCRA court summarily rejected this claim, not on the prejudice prong as suggested by the Commonwealth, but on the grounds that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to

a first degree murder must independently possess the specific intent to kill.

preserve the claim on appeal. *Id.* at 6. Alternatively, however, the PCRA court held that the ineffectiveness claim lacked arguable merit because Appellant's underlying *Huffman* challenge ignored the context of the court's broader instructions regarding accomplice and co-conspirator liability. *Id.* at 5 n. 6. The court further emphasized the factual differences between *Huffman* and the instant case by pointing out that in *Huffman,* the defendant and another individual simultaneously beat a man to death, and that the trial court erred by instructing the jury that the principal's state of mind could establish the accomplice's specific intent to kill. Here, the PCRA court opined, there was no suggestion that anyone other than Appellant's codefendant shot and killed the victims—the prosecution's theory was that Appellant supplied the gun, planned the killings, brought the victims to Curley, and encouraged, ordered, and threatened Curley to kill them. Unlike in *Huffman,* the PCRA court held that because the codefendant used a deadly weapon on vital parts of the victims' bodies pursuant to Appellant's commands, the jury could infer that Appellant himself had the specific intent to kill because he conspired with and assisted the codefendant. PCRA Ct. Opinion, Dec. 30, 2009, at 5 n. 6.

Upon examination of the arguments set forth by the parties and the rationale provided by the PCRA court, we agree that Appellant is not entitled to relief on this claim. Rather than denying relief based upon the arguable merit or reasonable basis prongs of the ineffectiveness test, as did the PCRA court, we find it more expeditious to dispose of the claim as suggested by the Commonwealth. We agree with the Commonwealth that, pursuant to our decision in *Daniels,* Appellant's ineffectiveness claim fails for lack of prejudice. Even assuming for purposes of argument that the portion of the charge cited by Appellant is in tension with our holding in *Huffman,* when read in its entirety, the instruction correctly described accomplice liability and criminal conspiracy, N.T. Apr. 11, 1996, Vol. XXVII, at 19–21, the elements of first degree murder, including that the defendant must possess the

specific intent to kill, *id.* at 28–29,[33] and informed the jury that the Commonwealth bore the burden of proving every element of the crime beyond a reasonable doubt. *Id.* at 2, 3. Thus, as in *Daniels,* we conclude that Appellant was not prejudiced as there is not a reasonable probability that the outcome of the trial would have changed had trial counsel objected to the jury charge.

## IX. Failure to Request Mere Presence Charge

 Appellant argues that trial counsel was ineffective for failing to request a jury charge stating that mere presence at the crime scene and knowledge of the crime are insufficient to establish conspiracy beyond a reasonable doubt. He submits that counsel's failure to request the charge casts doubt upon his murder convictions as well because he was not the actual shooter of the two victims, and the prosecution's sole theory of culpability for the murders relied on accomplice or conspirator liability. Thus, Appellant contends there is arguable merit to his ineffectiveness claim because, in the absence of the "mere presence and knowledge" charge, there is a strong likelihood that the jury reached its guilty verdicts on less than proof beyond a reasonable doubt. He maintains that counsel could not have had a reasonable basis for failing to request such instruction. Finally, Appellant submits, there is a reasonable likelihood that had trial counsel requested the instruction, the court would have given it, and the outcome of the trial would have been different.

The Commonwealth argues that this claim lacks arguable merit because the "mere presence and knowledge" instruction was not required. It asserts that the trial court correctly

**33.** Specifically, the trial court charged the jury as follows:

You may find the defendant guilty of first degree murder, if you are satisfied that the following three elements have been proven beyond a reasonable doubt. First, that Regina Clark, in the one charge, or Austin Hopper, in the other charge, is dead. Second, that the defendant or an accomplice or co-conspirator killed her, Regina Clark, in the one charge, or him, Austin Hopper, in the other charge, and third, *that the defendant did so with the specific intent to kill and with malice.*

*Id.* at 28 (emphasis added).

instructed the jury on the elements of criminal conspiracy, expressly acknowledging that the defendant must enter into an agreement that a member of the conspiracy will commit a crime. *See* N.T. Apr. 11, 1996, Vol. XXVII, at 33–35. This apprised the jury, the Commonwealth submits, that more than mere presence and knowledge of the crime is required. Moreover, it asserts, when instructing on accomplice liability, the trial court specifically informed the jury that a "defendant does not become an accomplice merely by being present at the scene or knowing about a crime." *Id.* at 20. Because the underlying claim lacks merit, the Commonwealth contends that counsel cannot be deemed ineffective for failing to pursue it. Additionally, the Commonwealth emphasizes that Appellant did not satisfy his burden of demonstrating that trial counsel lacked a reasonable strategy as he failed to elicit testimony from trial counsel at the PCRA hearing regarding this claim.

The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness. It emphasized that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal. *Id.* at 6.

We agree with the PCRA court that Appellant is not entitled to relief. The record supports the court's conclusion that Appellant failed to explore at the PCRA hearing trial counsel's strategy in not requesting the "mere presence and knowledge" charge. More significantly, however, we conclude that the proposed charge, while an accurate statement of the law, was unnecessary given that the trial court correctly charged the jury on the elements of conspiracy.[34] "The trial

---

**34.** The trial court charged, in pertinent part, as follows:

In order to find the defendant guilty of conspiracy to commit murder, you must be satisfied, initially, that the following two elements of conspiracy have been proven beyond a reasonable doubt. First, that

court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Smith*, 609 Pa. 605, 662, 17 A.3d 873, 906 (2011) (citing *Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 523 (2009)). Merely because the trial court did not choose the precise language suggested by Appellant does not render the charge inadequate. Thus, we reject Appellant's ineffectiveness claim for lack of merit.

## X. Consideration of Non–Statutory Aggravating Factors

 Appellant contends that trial counsel was ineffective for failing to object when the prosecutor referenced non-statutory aggravating factors during the penalty phase of trial. Without elaboration or citation to the record, he further argues that "the trial court failed to instruct the jury that it was precluded from considering this evidence of Appellant's prior bad acts and future dangerousness when making its sentencing determination." Initial Brief of Appellant at 83.

> the defendant agreed with another person or persons that they or one of them would engage in conduct which constitutes the crime of murder or an attempt to commit the crime of murder. Second, that the defendant did so with the intent of promoting or facilitating commission of the crime of murder.
> No person may be convicted of conspiracy, unless an overt act in pursuance of the conspiracy is alleged and proven to have been done by him or by a person with whom he conspired. In this case, it is—it is alleged that the following were overt acts: the killing of Regina Clark, the killing of Austin Hopper. Thus, you cannot find the defendant guilty, unless, in addition to the two elements of conspiracy, you are satisfied, beyond a reasonable doubt, that the defendant or a—or a person with whom the defendant conspired did the alleged over act in pursuance of the conspiracy.

*Id.* at 33–34. This charge is consistent with the Crimes Code definition of conspiracy set forth at 18 Pa.C.S. § 903(a), which states:

> (a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a).

Again without citation to the record, Appellant asserts that his sentencing proceeding was compromised by the prosecution's use of victim impact testimony and argument. He maintains that throughout the trial, "the prosecutor injected argument and evidence regarding how the murders affected the police investigators, the coroners, acquaintances, family members and Bradford County." *Id.* at 84. Appellant submits that trial counsel's lodging of objections to some of this evidence at trial demonstrates that he lacked a reasonable basis for failing to object to the same evidence during the penalty phase.[35] Finally, Appellant concludes, without analysis, that the jury's consideration of non-statutory aggravating factors prejudiced him.

The Commonwealth responds that this ineffectiveness claim fails for lack of arguable merit because Appellant has failed to identify the testimony, evidence, or argument to which trial counsel was ineffective for failing to object. *See Commonwealth v. Briggs,* 608 Pa. 430, 12 A.3d 291, 341 (2011) (rejecting a claim as waived for lack of development where the defendant fails to refer to particular evidence of record supporting the claim and fails to develop his argument). The Commonwealth also contends that the claim fails because Appellant did not question trial counsel regarding this claim at the PCRA evidentiary hearing, and, therefore, did not demonstrate that he lacked a reasonable basis for failing to object during the penalty phase of trial.

The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness. It emphasized that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal. *Id.* at 6. While the record supports the

35. Appellant does not identify that portion of the record where counsel objected at trial or the portion of the record where he should have objected during the penalty phase.

PCRA court's conclusion in this regard, we deny relief based on the lack of arguable merit due to Appellant's failure to identify those portions of the record which he found objectionable. *See Commonwealth v. Smith*, 604 Pa. 126, 985 A.2d 886, 906 (2009) (holding that the defendant's failure to develop properly his argument with proper citation to the record results in waiver of the claim).

## XI. Failure to Request *Simmons* Instruction

Appellant argues that because the Commonwealth injected his future dangerousness into the case by presenting evidence of his other crimes and referring to him as a "hit man," [36] trial counsel was ineffective for failing to seek an instruction which would have informed the jury that life imprisonment means a life sentence without the possibility of parole. *See Simmons v. South Carolina*, 512 U.S. 154, 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (where a plurality of the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible"); *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 273 (2006) (where this Court held that a *Simmons* instruction is mandated only if the prosecutor placed the defendant's future dangerousness at issue and the defendant requested the instruction at trial). Appellant submits that the only reasonable inference the jury could have drawn from evidence of his prior bad acts and his occupation as a "hit man" was that a sentence of death was necessary to prevent him from being a continued threat to society. He argues that had counsel raised the issue at trial, the trial court would have provided a "life means life without parole instruction," which would have fundamentally altered the jury's consideration and weighing of aggravating and mitigating evidence. He concludes that once the charge

---

36. Appellant cites four instances where the prosecutor and three witnesses refer to him as "hit man." He also references the testimony of Lea Curley and Bill Curley, which described threats of violence that Appellant had previously made against individuals not involved in this case.

was given, it is reasonably probable that at least one juror might have decided his penalty differently.

The Commonwealth responds that the claim fails for lack of arguable merit because the evidence to which Appellant cites does not implicate his future dangerousness. Rather, it contends, the testimony establishing that Appellant was a "hit man" was presented to illustrate why Curley would have believed Appellant when he offered to train Curley to become an assassin. According to the Commonwealth, the reasonable inference the jury would draw from the "hit man" reference is not that Appellant is a continuing threat to society, but that Appellant presented himself as a hired gun, acted in a manner consistent with that role, and, thus, Curley believed Appellant was an assassin. Regarding the testimony relating to Appellant's previous crimes or prior bad acts, it contends that there is no obvious link between Appellant's past crimes or prior bad acts and his future dangerousness, and the Commonwealth did not argue the same to the jury. The Commonwealth concludes that the ineffectiveness claim lacks arguable merit. Moreover, it notes, Appellant did not demonstrate that trial counsel lacked a reasonable strategy in failing to request a *Simmons* instruction because he did not question trial counsel at the PCRA evidentiary hearing regarding this claim.

The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness. It emphasized that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. PCRA Ct. Opinion, Dec. 30, 2009, at 1. The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal. *Id.* at 6.[37]

---

**37.** The PCRA court alternatively held that a "life means life without the possibility of parole" instruction was a falsehood. In its view, an honest charge would advise jurors that currently, a sentence of life imprisonment means that the defendant cannot be granted parole, however, the legislature has the power to change the law, and could make parole available to those sentenced to life imprisonment. PCRA Ct. Opinion, Dec. 30, 2009, at 3 n. 3.

We agree with the PCRA court that Appellant is not entitled to relief. To the extent that Appellant argues that his prior bad acts implicate his future dangerousness, this Court has expressly rejected such contention, thus, the ineffectiveness claim fails for lack of arguable merit. *See Commonwealth v. Paddy*, 15 A.3d 431, 454 (Pa.2011) (rejecting for lack of arguable merit a claim that trial counsel was ineffective for failing to request a *Simmons* charge because the prosecutor's reference to the defendant's past acts did not place the defendant's future dangerousness at issue). We similarly reject Appellant's contention that trial counsel was ineffective for failing to request a *Simmons* instruction after the prosecutor referred to him as a "hit man." Presumably, if the Commonwealth suggested to the jury that Appellant portrayed himself as being a "hit man," one could reasonably draw the inference that, if released into the general population, Appellant would resume his violent profession.[38] Considering that we are addressing a claim of ineffective assistance of counsel, however, the determination of whether the Commonwealth invoked Appellant's future dangerousness is not dispositive where the claim fails for lack of prejudice. When considering the aggravating circumstances that Appellant was responsible for the deaths of two innocent people, one of which was a child, it is not probable that at least one juror would have voted for life imprisonment had he or she only been instructed that a life sentence means life without parole. Accordingly, Appellant's ineffectiveness claim fails.

## XII. Failure to Grant a Continuance

Appellant argues that the trial court erred by denying his March 5, 1996[39] motion for a continuance of his April 25, 1996 trial date. Significantly, he does not allege either trial or appellate counsel's ineffectiveness relating to this claim.

38. That is not to say that the Commonwealth's purpose in making the "hit man" references was to inject Appellant's future dangerousness into the case. Rather, it is clear that Appellant's portrayal of himself as an assassin was the key to the factual premise underlying both murders.

39. Our opinion on direct appeal reflects that Appellant's motion for a continuance was filed in February of 1996, and that a hearing on the motion was held on March 5, 1996.

While he acknowledges that he challenged the trial court's denial of his continuance request on direct appeal, he asserts, without elaboration, that this Court failed to address adequately the issue. The record does not support this contention. On direct appeal, this Court examined whether the trial court abused its discretion by failing to grant Appellant a continuance of his trial date so that defense counsel could travel to Arkansas to interview prospective witnesses personally, rather than sending an investigator to do so, and to complete DNA testing on semen found on Regina Clark's body.[40] The Court found no abuse of discretion. *Koehler*, 737 A.2d at 236–37.

To the extent Appellant reiterates that a continuance of his trial date was warranted for the aforementioned reasons, the claim has been previously litigated on direct appeal. *See* 42 Pa.C.S. § 9544(a)(2) (providing that an issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue"). To the extent Appellant argues additional grounds in support of his request for a continuance that were not addressed on direct appeal, the claim is waived as Appellant has failed to even allege that such grounds were properly preserved at trial and on direct appeal. *See id.* at § 9544(b) (providing that a PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding"). Further, he has failed to allege that counsel was ineffective for failing to preserve the independent grounds in support of a request for a continuance.

### XIII. Cumulative Error

Finally, Appellant argues that the cumulative error or prejudice arising from the various constitutional violations that occurred in his case warrant relief. As cogently

40. We noted on direct appeal that subsequent DNA testing indicated that while neither Curley nor Schrader could have been the source of the semen found on Clark's body, Appellant could have been the source. This finding was consistent with the trial testimony indicating that Appellant and Clark were romantically involved. *Koehler*, 737 A.2d at 236 n. 20.

noted by the Commonwealth, this Court has repeatedly held that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009). Thus, to the extent claims are rejected for lack of arguable merit, there is no basis for an accumulation claim. *Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 671 (2008). When the failure of individual claims is grounded in lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed. *Johnson*, 966 A.2d at 532 (citing *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994), for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

Here, we rejected ineffectiveness claims based on a lack of prejudice in connection with the following three claims: (1) Claim VI, relating to trial counsel's failure to present adequate mitigating evidence at the penalty phase; (2) Claim VIII, relating to trial counsel's failure to object to the trial court's instruction on the specific intent to kill required for a first degree murder conviction; and (3) Claim XI, relating to whether trial counsel was ineffective for failing to request a *Simmons* instruction after the Commonwealth referred to Appellant as a "hit man." We have already decided that these claims individually did not prejudice Appellant, and now conclude that they do not prejudice him when considered in the aggregate. Thus, Appellant is not entitled to relief on his claim of cumulative error.

Accordingly, for the reasons set forth herein, we affirm the order of the PCRA court dismissing Appellant's PCRA petition.[41]

Chief Justice CASTILLE, Justices EAKIN, TODD, McCAFFERY and ORIE MELVIN join the opinion.

Justice SAYLOR files a concurring opinion.

41. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Justice SAYLOR, concurring.

I join Parts I(A), IV, V, VII, VIII and IX of the majority opinion and concur in the result for the balance. My most particular differences are as follows.

Initially, I do not support the majority's treatment of the Commonwealth's non-disclosure of its agreement with witness Kirk Schrader, and specifically, the majority's conclusion that "it strains logic to conclude that Appellant could have used such agreement to impeach Schrader's testimony[.]" Majority Opinion, at 188, 36 A.3d at 138. In the first instance, the reasoning is inconsistent with the judicial finding that Schrader "willingly inculpated himself because he had been told that he would not be prosecuted if he cooperated." *Commonwealth v. Schrader*, No. 96 CR000286, *slip op.* at 8 (C.P. Bradford May 22, 1997). Moreover, had the agreement been disclosed to the defense by the Commonwealth—as it should have been per federal constitutional law—I do not appreciate how the acknowledged fact of such agreement would not have served to impeach Schrader's testimony that there was no favorable treatment.[1]

Finally, as to the claim of deficient stewardship arising from trial counsel's failure to prepare adequately for the penalty hearing, I do not share the majority's certitude that a no-prejudice finding is inescapable. *See* Majority Opinion, at 212–214, 36 A.3d at 153–54. The federal constitutional standard pertaining to claims of ineffective assistance of counsel places appellate courts in a difficult position where a trial attorney did not do his job. We are to essentially speculate whether each one (and every one) of twelve individuals, having twelve unique mindsets which we cannot know, would have supported a death sentence, had an appropriate defense presentation been made. *See Wiggins v. Smith*, 539 U.S. 510, 537, 123 S.Ct. 2527, 2543, 156 L.Ed.2d 471 (2003) (explaining that prejudice is assessed according to whether a single juror might have struck a different balance); *accord* 42 Pa.C.S.

---

1. The common pleas court's explanation—which essentially accepts that there was an agreement, but allows that neither the Commonwealth nor Schrader should be charged with owning up to its terms for purposes of Appellant's trial—does not seem to me to be creditable.

228

§ 9711(c)(1)(iv). An appellate no-prejudice finding can mean that a capital defendant will never receive a single trial in which he is represented by competent counsel. Indeed, such a finding is tantamount to a determination that adequate representation is merely beside the point, since the defendant never stood a reasonable chance of avoiding a death verdict in any event. The decision is further complicated by the fact that juries do not return such verdicts in every capital case in which the defendant has committed a heinous murder, or even multiple killings.

I am most troubled by the speculativeness inherent in no-prejudice determinations, in view of the volume of cases in which we are being required to undertake them (due to a lack of preparedness on the part of members of the capital defense bar). Whatever the source of the problem—be it underfunding, training deficiencies, or trial management issues within the control of the common pleas courts—it obviously needs to be addressed by the State on an urgent and ongoing basis. In the interim, I believe we should err on the side of providing defendants with one trial at which the defense is guided by a competent, prepared lawyer.

That said, I have regularly discharged my responsibility to apply the governing federal constitutional standard and have supported no-prejudice determinations in other cases. *See Commonwealth v. Lesko*, 609 Pa. 128, 249, 15 A.3d 345, 418 (2011) (Saylor, J., concurring) (collecting cases). Ultimately, I do so here also, albeit with circumspection.