J-S57018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DEVIN ROUSE | |
| Appellee | No. 3020 EDA 2014 |

Appeal from the PCRA Order September 30, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0713202-2002

BEFORE: MUNDY, J., OTT, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                    **FILED JANUARY 12, 2016**

The Commonwealth appeals from the September 30, 2014 order granting the petition for relief filed by Appellee, Devin Rouse, pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546. After careful review, we reverse.

On Appellee's direct appeal, a previous panel of this Court summarized the relevant factual history of this case as follows.

> On April 12, 2002, at approximately 11:00 p.m., Brian Birkelback, (hereinafter "Brian"), his girlfriend, Cassandra Ketterer (hereinafter "Cassandra"), and his brother, Michael Birkelback ("Michael"), went to the corner of Rising Sun and Gilham to pick up a few friends before heading to a bar. (N.T. 12/9/04 pp. 140-143). Katilynne Mcelroy [sic] (hereinafter "Katilynne"), Brian's cousin, John Fearnley (hereinafter "Fearnley"), John Scarpello (hereinafter "Scarpello"), Scott Fitzpatrick (hereinafter "Scott"), Richard Kostelny (hereinafter

"Richard"), Michelle Sayers (hereinafter "Michelle"), and Tammy Jauss (hereinafter "Tammy") were sitting on the steps of the Classic Optical store located at the corner of Rising Sun and Gilham. (N.T. 12/8/04 pp. 26-28). After Brian arrived, Katilynne's attention was drawn to a gold car moving slowly up Rising Sun Avenue; it appeared that the people in the car were looking at them. Suspecting trouble, Katilynne and Michelle went into the house, and everyone [else] got into Brian's car. (N.T. 12/8/04 pp. 44-53). Brian was the driver, Cassandra was next to him and Richard sat in the front next to the door. In the rear, Michael was behind Brian, Scarpello was next to him, Fearnley was next to him, and Tammy sat on Scott's lap behind Richard. (N.T. 12/8/04 pp. 115-117; N.T. 12/13/04 p. 93).

At approximately 11:45 p.m., before the car pulled off, Richard saw the defendants approach the passenger side of the car; [co-defendant] Naem [Waller] stood at the front passenger window. Scarpello was suspicious of Naem because he approached the car with money in his hands and asked if anyone wanted to buy weed. Everyone in the car stated that they were not interested in buying weed. (N.T. 12/7/04 pp. 173-174; N.T. 12/8/04 pp. 117-124; N.T. 12/13/04 pp. 95-96). At that point, Scott yelled, "Oh, man, we're getting robbed." Richard noticed a gun in Naem's hand and screamed, "[t]hat's a fake." He noticed that [Appellee], who was also on the passenger side, had a silver 9mm gun in his hand. (N.T. 12/8/04 pp. 117-124; N.T. 12/9/04 pp.15-16). Michael noticed a third male on the driver's side. Brian exited the car and began fighting the male on the driver's side of the car. [Appellee] fired three shots, one struck Brian in the back. (N.T. 12/9/04 pp. 18-19; 149-151). Everyone got out of the car and Michael grabbed Brian and helped him to the ground. *Id.* at 19. Immediately after the shots were fired, [Appellee], Naem and the third male ran off. (12/8/04 pp. 126-128). Katilynne, who was in the

house, heard the shots, looked out the window, saw Brian on the street and came outside. *Id.* at 53-54.

Officer Baird arrived at the intersection of Gilham Street and Rising Sun Avenue at approximately 11:50 p.m. and saw Michael and Cassandra holding Brian as he lay in the street. Officer Baird attempted to speak with the occupants of the vehicle in order to get a description of the perpetrators to give out over police radio. He found a fired cartridge case on the back of Brian's car, one on the side walk, and a projectile in the street. The medical unit arrived and attempted to render aid to Brian before he was transported to Temple hospital. (N.T. 12/7/04 pp. 145-172).

Michael Klepesky (hereinafter "Mr. Klepesky"), who lived approximately a half [of] a mile from the scene of the incident, was listening to a police scanner when he heard a report of a shooting near Gilham Street and Rising Sun, and that the getaway car, a gold four-door car, was traveling south on Oxford Avenue. After hearing the report, Mr. Klepesky took his dog outside for a walk in the alley behind his house when he saw a gold four-door car speeding through the alley. He noted that the car fit the description he heard on the police scanner, there were no less than four people in the car as it screeched around the corner. He lost sight of the car but heard a loud crash. Shortly thereafter he saw a black male wearing a dark hoody and dark jeans with a white tee-shirt under the hoody walking towards the mini-mart on Oxford Avenue. Then he saw another male walking down Oxford Avenue towards Loretto Avenue wearing a white tee shirt and dark jeans. This male went to a phone booth, dialed a number, hung up, and quickly walked away. Ten minutes later he saw a police car and stopped them to tell them what he saw. The officers put this information out over police radio. The officer placed Mr. Klepesky in the car and drove around looking for the gold car; they traveled approximately one block before they saw the gold four-door car parked on the side walk. Police officer Dawson, [sic] felt the hood

- 3 -

of the car and it was hot; there was some light bumper damage and the hood was also crumpled a bit. (N.T. 12/9/04 pp. 80-105; N.T. 12/13/04 pp. 180-197). Other officers transported Katilynne and Michael to the location of the gold car and she identified it as the car she saw moving slowly up Rising Sun Avenue just before the shooting. (N.T. 12/8/04 pp. 56-58). Mr. Klepesky identified the car as the one he saw speeding through the alley. (N.T. 12/9/04 p. 89).

Officer Craig Perry[,] after receiving information over [the] police radio[,] saw a black male, later identified as [Appellee], wearing a white tee-shirt and blue jeans in the Oxford Circle area. Officer Perry approached [Appellee] and asked him his name, to which he replied "Devlin Womack." [Appellee] stated that he was in the area to meet a female who he met on the internet. (N.T. 12/14/04 pp. 9-20). Shortly thereafter, the police brought Michael, who was visibly distraught, and Katilynne to take a look at [Appellee] to see if they could make an identification. [Appellee] was presented to them but neither made an identification. (N.T. 12/8/04 pp. 57-59, 69-70). Mr. Klepesky was brought to the area to see if he could identify [Appellee] as one of the males he saw earlier, he was unable to do so. (N.T. 12/9/04 pp. 116-117). [Appellee] was taken to the homicide unit where he gave a statement to the police that he was not involved in the shooting. (N.T. 12/14/04 pp. 149-153).

Brian was pronounced dead at 12:19 a.m. at Temple Hospital. (N.T. 12/7/04 p. 155). Doctor Gregory McDonald, the medical examiner, testified that Brian died from a gunshot wound that entered the lower portion of the back, severing the spinal cord. The bullet proceeded through the aorta, then proceeded through several portions of his intestines and exited out the front part of the abdominal wall. (N.T. 12/13/04 pp. 151-152).

In the early morning of April 13, 2002, Police Officer William Gross ascertained that the gold car

involved in the incident belonged to Diane Waller, the mother of Naem Waller. Later that day[,] at approximately 5:32 a.m., the car was reported stolen but it had no signs of forced entry to suggest that it had been stolen. (N.T. 12/14/04 p. 70-77). On April 14, 2002, in the early morning, Police Officer Trenwith photographed the vehicle and recovered five pieces of clothing, a black leather jacket, a baseball hat, skull cap, and a glove in the car. The items found in the car were transmitted to the Criminalistics Laboratory for analysis. Latent prints were also lifted from inside the car and a half full Smirnoff Twist bottle found in the car. It was subsequently determined that Naem's fingerprints were on the half full Smirnoff [Twist] bottle, a CD cover, and an envelope; Diane Waller's fingerprints were found on the glove compartment. *Id.* at 108-132. The results of the Criminalistics analysis revealed [Appellee's] DNA on the sweat band of the baseball hat taken from the car. (N.T. 12/15/04 p. 34).

Immediately after the shooting, Richard, Michael, Cassandra, and Scarpello gave statements to the police and a description of two of the three males involved in the shooting. The witnesses described one of the perpetrators as a light skinned black male or a Hispanic male. (N.T. 12/9/04 p. 70, 155, 169; 12/8/04 pp. 130-131; 12/13/04 pp. 136-137). Everyone described the second male as a darker skinned black male. *Id.* A few days later, Cassandra assisted the police in drawing a sketch of the light skinned male. (See Exhibit "C-22"). On May 15, 2002, Richard, Michael, Cassandra, and Scarpello were taken to the homicide unit and asked to view two photo arrays[;] each contained a photo of one of the defendants. Richard identified the photo of [Appellee] but not Naem. (N.T. 12/8/04 pp. 34-138). Michael identified both the photos of [Appellee] and Naem. (N.T. 12/9/04 pp. 34-35). Cassandra identified the photo of Naem but not [Appellee]. *Id.* at 162 163. Scarpello could not make any identification. (N.T. 12/13/04 pp. 102-103). At a subsequent line-up, Richard and

Scarpello identified [Appellee] and Michael identified Naem. Everyone else selected someone other than the defendants or could not make any identification from the lineup. (N.T. 12/15/04 pp. 112-125).

On May 13, 2002, Ty-Ron Rouse, [Appellee's] first cousin, was in custody on another matter. Ty-Ron told the police that [Appellee] told him that he went to rob Brian with two other people. Brian jumped out of the car and he thought he had a weapon so he shot him in the back. [Appellee] told him that he used a 9mm to shoot Brian, they left the car on Roosevelt Boulevard and he threw the gun in the river. The police picked him up for questioning and he told them that he was on his way to see a girl. Ty-Ron testified at trial concerning what [Appellee] told him as well as how he knew Brian, Michael, [Appellee] and Naem. Ty-Ron stated that [Appellee] knew Michael because he bought prescription drugs from him. He also testified that [Appellee] and Naem knew each other very well and that Naem had access to his mother's car. (N.T. 12/13/04 pp. 37-53).

On May 20, 2002, Police Officer Patrick Whalen went to 2016 Rowan Street, [Appellee's] residence, to arrest him. [Appellee] was found in the basement sitting under a table with a blanket over the top of his body. ([N.T.] 12/15/04 pp. 55-58).

*Commonwealth v. Rouse*, 902 A.2d 981 (Pa. Super. 2006) (unpublished memorandum at 1-6) (**Rouse I**), *appeal denied*, 909 A.2d 304 (Pa. 2006), *quoting* Trial Court Opinion, 4/29/05, at 2-6.

After two trials that ended in hung juries, Appellee proceeded to a third jury trial, at the conclusion of which, Appellee was convicted of second-degree murder, robbery, carrying a firearm without a license, and

- 6 -

possessing an instrument of crime.[1]  On February 14, 2005, Appellee was sentenced to an aggregate sentence of life imprisonment without the possibility of parole.  This Court affirmed the judgment of sentence on April 13, 2006.  **Rouse I**, **supra** at 7.  Our Supreme Court denied Appellee's petition for allowance of appeal on October 12, 2006.  **Id.**

Appellee filed the instant timely *pro se* PCRA petition on October 10, 2007.  The PCRA court appointed counsel who filed an amended petition on Appellee's behalf on September 26, 2008.  The PCRA court issued its notice of intent to dismiss Appellee's petition without a hearing pursuant to Pennsylvania Rule of Criminal Procedure 907 on January 15, 2009.  Appellee did not file a response, and the PCRA court dismissed the petition on March 5, 2009.  Appellee filed a timely notice of appeal, and this Court vacated the PCRA court's order and remanded for an evidentiary hearing on Appellee's petition, including the claim at issue in this appeal, "that trial counsel was ineffective for failing to assert [Appellee]'s due process right to present evidence that a third person had committed the offenses with which [Appellee] was charged."  **Commonwealth v. Rouse**, 38 A.3d 925 (Pa. Super. 2011) (unpublished memorandum at 3) (**Rouse II**).

On remand, the PCRA court conducted an evidentiary hearing on January 27, 2014.  After permitting the parties to file post-hearing briefs,

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3701(a), 6106, and 907(a), respectively.

the PCRA court entered an order granting Appellee's PCRA petition and ordering a new trial. On October 21, 2014, the Commonwealth filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), although the PCRA court did not order it to file said statement. The PCRA court filed its Rule 1925(a) opinion on January 9, 2015.

On appeal, the Commonwealth presents the following issue for our review.

> Did the PCRA court err in finding trial counsel was ineffective for purportedly failing to argue a defense motion to admit other crimes evidence, where the evidence was inadmissible and [Appellee] was not prejudiced?

Commonwealth's Brief at 5.

We begin by noting our well-settled standard of review. "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." **Commonwealth v. Fears**, 86 A.3d 795, 803 (Pa. 2014) (internal quotation marks and citation omitted). "The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." **Commonwealth v. Spotz**, 84 A.3d 294, 311 (Pa. 2014) (citation omitted). "It is well-settled that a PCRA court's credibility determinations are binding upon an appellate court so long as they are supported by the record." **Commonwealth v.**

*Robinson*, 82 A.3d 998, 1013 (Pa. 2013) (citation omitted). However, this Court reviews the PCRA court's legal conclusions *de novo*. *Commonwealth v. Rigg*, 84 A.3d 1080, 1084 (Pa. Super. 2014) (citation omitted).

The Sixth Amendment to the Federal Constitution provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence."[2] U.S. Const. amend. VI. The Supreme Court has long held that the Counsel Clause includes the right to the effective assistance of counsel. *See generally Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

In analyzing claims of ineffective assistance of counsel, "[c]ounsel is presumed effective, and [appellant] bears the burden of proving otherwise." *Fears*, *supra* at 804 (brackets in original; citation omitted). To prevail on any claim of ineffective assistance of counsel, a PCRA petitioner must allege and prove "(1) the underlying legal claim was of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) the petitioner was prejudiced—that is, but for counsel's deficient stewardship, there is a reasonable likelihood the outcome of the proceedings would have

---

[2] Likewise, Article I, Section 9 of the Pennsylvania Constitution states in relevant part, "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel …." Pa. Const. art. I, § 9. Our Supreme Court has held that the Pennsylvania Constitution does not provide greater protection than the Sixth Amendment. *Pierce*, *supra* at 976.

been different." ***Commonwealth v. Simpson***, 66 A.3d 253, 260 (Pa. 2013). "A claim of ineffectiveness will be denied if the petitioner's evidence fails to satisfy any one of these prongs." ***Commonwealth v. Elliott***, 80 A.3d 415, 427 (Pa. 2013) (citation omitted), *cert. denied*, ***Elliott v. Pennsylvania***, 135 S. Ct. 50 (2014).

The issue upon which the PCRA court granted relief was that trial counsel was ineffective for not arguing, as a matter of due process, that Appellee had a constitutional right to introduce evidence to show that "Ty-Ron … committed a similar robbery with Naem, three weeks after the robbery for which Appellee was convicted[.]" PCRA Court Opinion, 1/9/15, at 4. Appellee wished to introduce the facts of the subsequent robbery in an effort to prove that Ty-Ron committed the instant robbery. ***Id.*** at 7. On appeal, the Commonwealth argues that Appellee failed to meet his burden as to all three prongs of the ***Pierce*** test and his claim should have been rejected. Appellee counters that counsel was ineffective, lacked a reasonable basis to not pursue the due process claim, and Appellee was prejudiced as a result.[3]

_____

[3] Appellee also argues that the Commonwealth waived its entire argument on appeal for failure to argue its issue in its Rule 1925(b) statement. Appellee's Brief at 65-69. However, Rule 1925(b) states that the statement shall "be deemed to include every subsidiary issue contained therein which was raised in the trial court." Pa.R.A.P. 1925(b)(4)(v). In our view, the issue of whether trial counsel should have raised the other robbery evidence
*(Footnote Continued Next Page)*

We elect to only address the parties' arguments on the prejudice prong of the **Strickland**/**Pierce** framework, as we conclude it is dispositive of the instant appeal. Our Supreme Court has described the required prejudice showing in the following terms.

> Relating to the prejudice prong of the ineffectiveness test, the PCRA petitioner must demonstrate that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different. Particularly relevant herein, it is well-settled that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the **Strickland** test, the court may proceed to that element first.

**Commonwealth v. Koehler**, 36 A.3d 121, 132 (Pa. 2012) (citation omitted).

For the purposes of this appeal, we assume, without deciding, that the PCRA court correctly concluded that Appellee had a constitutional right to admit the facts of the second robbery in order to show that Ty-Ron committed the instant robbery and that counsel lacked a reasonable basis for not arguing this point. However, our review of the record reveals that Appellee was not prejudiced by this evidence's exclusion from trial.

Here, the Commonwealth presented DNA evidence that showed Appellee's DNA was found on the inside rim of a baseball cap that was

_(Footnote Continued)_ ⸻

on a different ground is a subsidiary issue of the claim raised by the Commonwealth's Rule 1925(b) statement.

recovered from inside the robber's vehicle. N.T., 12/14/04, 129-131; N.T., 12/15/04, at 34-35. Michael Birkelback affirmatively testified that Ty-Ron was not present at the crime scene. N.T., 12/9/04, at 26-27. More specifically, Michael testified that Appellee, not Ty-Ron, was the one who killed Brian. N.T., 12/9/04, at 27, 34. Furthermore, Kostelny and Scarpello identified Appellee in a line-up proceeding and at trial. N.T., 12/8/04, at 117, 134, 145; N.T., 12/13/04, at 135. Appellee was stopped by police in the vicinity of where the robber's vehicle was found. N.T., 12/14/04, at 9-20. When stopped by police, Appellee gave the police a fake name and an implausible story as to why he was in the area at the time. *Id.* at 13-16, 18; *see also Commonwealth v. Toro*, 638 A.2d 991, 998 (Pa. 1994) (stating, "prosecutor [properly] elicited information regarding appellant's use of different names during his contacts with the police … [because e]vidence of this type was relevant to the issue of appellant's consciousness of guilt[]"). As noted above, when the police apprehended Appellee, he was found hiding in the basement under a table, concealing himself under a blanket. N.T., 12/15/04, at 57-59; *see also Commonwealth v. Johnson*, 838 A.2d 663, 68 (Pa. 2003) (stating, "where evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt[]").

When taken together, we conclude that even if Appellee were to present the facts of the second robbery to attempt to establish that Ty-Ron

committed both robberies, Appellee did not meet his burden with regard to prejudice. The existence of DNA evidence, eyewitness identifications, Appellee's alias, story, and concealment lead us to conclude that there was not "a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different." *Koehler*, *supra*. Therefore, Appellee did not meet his burden under the *Strickland*/*Pierce* test, and the PCRA court incorrectly ordered a new trial in this case.[4]

Based on the foregoing, we conclude the PCRA court erred when it granted Appellee's PCRA petition. *See Fears*, *supra*. Accordingly, the PCRA court's September 30, 2014 order is reversed, and the February 14, 2005 judgment of sentence is hereby reinstated.

Order reversed. Judgment of sentence reinstated. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/12/2016

---

[4] As noted above, because Appellee's claim failed to meet the prejudice prong of the *Strickland*/*Pierce* test, we need not address the arguable merit or reasonable basis prongs. *See Elliott*, *supra*.